**INTALCO ALUMINUM CORPORATION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

and

**International Association of Machinists and Aerospace Workers, AFL–CIO, Intervenor.**

**No. 22633.**

United States Court of Appeals Ninth Circuit.

Sept. 19, 1969.

Rehearing Denied Oct. 21, 1969.

Roy E. Potts (argued), of Kindel & Anderson, Los Angeles, Cal., for petitioner.

Jerome N. Weinstein (argued), Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Gary Green, Atty., Washington, D. C., for respondent.

Plato E. Papps, Gen. Counsel, Washington, D. C., Vance, Davies, Roberts & Bettis, Seattle, Wash., Emil Narick, Atty., United Steelworkers, Pittsburgh, Pa., Herbert S. Thatcher, Washington, D. C., for intervenor.

Before CHAMBERS and DUNIWAY, Circuit Judges, and JAMESON *, District Judge.

JAMESON, District Judge:

Petitioner seeks to review and set aside an order of the National Labor Relations Board, issued February 21, 1968, holding that petitioner violated Section 8(a) (2) and (1) of the National Labor Relations Act [1] by recognizing and entering into a contract with the International Association of Machinists and Aerospace Workers, AFL–CIO (Machinists) at a time when it was a minority union. The union appears as intervenor. The Board in its answer requests that its order be enforced in full.

The petitioner employer, Intalco Aluminum Corporation, a Delaware Corporation, began the construction of an aluminum manufacturing plant in Ferndale, Washington, in 1965. The first hourly employee was hired in June.

---

* Honorable William J. Jameson, United States Senior District Judge, Billings, Montana, sitting by designation.

1. Section 8(a) of the Act provides that it "shall be an unfair labor practice for an employer (1) to interfere with, restrain, or coerce employees" in the exercise of their rights to "self organization, to * * * join * * * labor organizations, to bargain collectively through representatives of their own choosing * * *" (section 7); (2) "to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it * * *." (29 U.S.C. §§ 157, 158)

During the summer and fall of 1965 representatives of the Machinists, Aluminum Workers,[2] and Steelworkers[3] informed petitioner that they would attempt to organize its employees at the Ferndale plant. The three unions, and subsequently a fourth union[4] began campaigns among the company's employees. By the middle of March, 1966, all four unions were actively soliciting members through the use of signed authorization cards.

On March 10, 1966, the Machinists informed petitioner that it represented a majority of the employees and demanded recognition. The union offered to prove its majority by submitting its authorization cards to a neutral third party for a card check. Petitioner agreed with Machinists that the check should be made by a representative of the Washington State Department of Labor and Industries. Petitioner and the union met with the State representative on March 16, 1966. Petitioner produced a list of its 122 employees. It informed the State representative that, in addition to the Machinists, at least two other unions (the Aluminum Workers and Steelworkers) were then engaged in organizational activities.[5] Neither of these unions had demanded recognition. Neither union was notified of the card check by either petitioner or the State representative.

On March 16, the State representative compared the authorization cards with signatures known to be authentic in petitioner's files. 81 cards were found to be genuine. The cards used in the check were clear and unambiguous authorizations.[6] As the State representative found that the company had a complement of employees, 122 in number,[7] the 81 cards were deemed to establish the majority status of the Machinists. As a consequence petitioner and Machinists entered into a recognition agreement. On March 17 notice of recognition of the Machinists was posted in the plant.

The following day, March 18, the Aluminum Workers filed a representation petition before the Board, naming itself, the Steelworkers and Machinists as labor organizations which either claimed recognition from the company, or were known by it to have a representative interest in its employees. 44 authorization cards were filed by the Aluminum Workers. Of these, 30 cards were signed by employees who had also signed cards for the Machinists. The Steelworkers, Aluminum Workers and the Metal Trades Unions filed "blocking charges", alleging violations of section 8(a) (2) and (1) of the Act.

On April 14, 1966, petitioners and Machinists entered into a collective bargaining agreement, with a termination date of July 1, 1968. The agreement contained a union security clause and provided for dues check-off.

The Trial Examiner found that petitioner notified the Washington State representative of the organizational campaigns of the Aluminum Workers and Steelworkers; that had the representative called upon these unions he would

2. Aluminum Workers International Union, AFL–CIO.

3. United Steelworkers of America, AFL–CIO.

4. Bellingham Metal Trades Council, Allied Industrial Division.

5. During March the Steelworkers had a trailer parked close to the main gate, with a large, clearly visible sign showing its occupants.

6. The authorization card read:
"YES, I WANT THE IAM

"I, the undersigned employee of ............... hereby authorize the International Association of Machinists and Aerospace Workers (IAM) to act as my collective bargaining agent with the company for wages, hours and working conditions. It is my understanding that I will be invited to join the IAM."

7. The General Counsel contended before the Trial Examiner that there was not a representative complement of employees in the plant at the time of recognition. Both the Trial Examiner and Board resolved this issue against the General Counsel.

have found 44 cards from the Aluminum Workers and 81 from intervenor; that 31 employees signed cards for both unions, and of these 22 signed cards for the Aluminum Workers which "revoked the cards previously signed for the intervenor";[8] that petitioner "extended recognition to, and executed a contract with, the Intervenor" at a time when intervenor did not represent a majority of the employees and when a question of representation existed. The examiner found further that "there was an absence of bad faith on the part of" petitioner. He recommended an order that petitioner cease and desist from recognizing the Machinists and from giving effect to the contract executed with it; that petitioner withdraw and withhold all recognition from the Machinists, unless and until certified by the Board; and that petitioner reimburse all employees for dues and other moneys paid under the contract with the Machinists.

The Board adopted the Trial Examiner's findings, conclusions, and recommended order.

Two issues are presented: (1) whether the Board properly found that petitioner violated section 8(a) (2) and (1) of the Act by recognizing and executing a contract with the Machinists at a time when the Machinists represented a minority of the unit employees; and (2) if so, whether the reimbursement order was proper.

"The law has long been settled that a grant of exclusive recognition to a minority union constitutes unlawful support in violation of (section 8(a) (2)), because the union so favored is given 'a marked advantage over any other in securing the adherence of employees', National Labor Relations Board v. Pennsylvania Greyhound Lines, 303 U.S. 261, 267, 58 S.Ct. 571, 574, 82 L.Ed. 831". International Ladies Garment Workers Union AFL–CIO v. N. L. R. B., 1961, 366 U.S. 731, 738, 81 S.Ct. 1603, 1607, 6 L.Ed.2d 762. Nor does a showing of "good faith" in itself excuse an employer who in fact recognizes a minority union.[9]

Relying upon Snow v. N. L. R. B., 9 Cir. 1962, 308 F.2d 687, 693, petitioner argues that upon demand an employer must recognize the union if the employer entertains no good faith doubt concerning the union's majority status and may not safely refuse to rely on authorization cards submitted by the union.[10] It is true that Snow holds that an employer has no right to deny recognition if it "has no reasonable doubt that the union had majority status". This does not mean, however, that an employer, even though acting in good faith, may recognize a minority union without a "reasonable effort to determine" the validity of the union's claim that it represents a majority of the employees, particularly where circumstances cast doubt upon the claim.[11]

8. More specifically, the Trial Examiner found that the fact that 31 employees had signed cards for both unions "would (alone) call for settling the question of representation by a secret election", but "a more decisive factor" was the signing of 22 cards revoking "the cards previously signed for the Intervenor", leaving "59 unrevoked cards which represents a minority of the employees".

9. In Garment Workers v. N. L. R. B., supra, the Court said in part: "To countenance such an excuse (good-faith belief in petitioner's majority status) would place in permissibly careless employer and union hands the power to completely frustrate employee realization of the premise of the Act—that its prohibitions will go far to assure freedom of choice and majority rule in employee selection of representatives. * * *

It follows that prohibited conduct cannot be excused by a showing of good faith." (366 U.S. 738, 739, 81 S.Ct. 1608).

10. Under Section 8(a) (5) of the Act, 29 U.S.C. § 158(a) (5), it is an unfair labor practice for an employer to "refuse to bargain collectively with the representatives of his employees subject to the provisions of section 9(a)", 29 U.S.C. § 159 (a). Section 9(a) provides for exclusive representation by a union "designated or selected for the purposes of collective bargaining by the majority of the employees" in an appropriate unit.

11. Moreover, the rule in Snow and similar cases has been modified in the Board's current practice. As noted in N.L.R.B. v. Gissel Packing Company and companion cases, 395 U.S. 575, 89 S.Ct. 1918,

In the recent case of N. L. R. B. v. Gissel Packing Company and companion cases, decided June 16, 1969, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 [12] the Supreme Court reaffirmed the rule that a union may establish its majority status by "possession of cards signed by a majority of the employees authorizing the union to represent them for collective bargaining purposes" and followed its holding in United Mine Workers of America v. Arkansas Flooring Co., 1956, 351 U.S. 62, 76 S.Ct. 559, 100 L.Ed. 941, that "where the union had obtained signed authorization cards from a majority of the employees * * * (i)n the absence of any bona fide dispute as to the existence of the required majority of eligible employees, the employer's denial of recognition of the union would have violated § 8(a) (5) of the Act'. 351 U.S. at 69, 76 S.Ct. at 563 [559]". (395 U.S. at 597–598, 89 S.Ct. at 1931–1932).

It is recognized also that a check of authorization cards by a state agency is a valid method of establishing majority status, and that in a proper case the Board will give binding effect to the agency's determination. Western Meat Packers, Inc., 148 N.L.R.B. 444, 57 N.L. R.R.M. 1028 (1964) Enforcement denied on other grounds, 10 Cir. 1965, 350 F.2d 804; West Indian Co. Ltd., 129 N.L.R.B. 1203, 47 L.R.R.M. 1146, 1147 (1961).[13]

▪ This does not mean, however, that an employer may rely upon an inadequate and improper check of authorization cards by a state agency and extend recognition to a union which does not in fact represent the majority of its employees. Under the circumstances here neither petitioner nor the State representative could properly rely upon a card check without giving the competing unions an opportunity to submit their cards or other evidence that intervenor did not represent a majority of the employees.

Both the employer and State representative knew that the Aluminum Workers and Steelworkers, as well as the Machinists, were engaged in organizational activities at the time the Machinists demanded recognition. Had proper inquiry been made, the duplicate signatures would have been disclosed.[14] As the Trial Examiner properly found, after deducting from the 81 signatures found genuine the 22 cards signed for the Aluminum Workers revoking their signatures for the Machinists, the Machinists were left with at most 59 employees, a minority of the 122 in the unit.

We agree with the Board "that at the time of recognition a question concerning representation existed and that the investigation and resolution of that question was not attended by appropriate safeguards * * * ". We conclude that the Board properly found that petitioner violated section 8(a) (2) and (1) of the Act by recognizing and executing a contract with the Machinists at a time when the Machinists represented only a minority of the unit employees.

▪ The second question presented on this appeal is whether that portion of the Board's order requiring reimbursement of dues is proper. Because of the union

"Under the Board's current practice, an employer's good faith doubt is largely irrelevant, and the key to the issuance of a bargaining order is the commission of serious unfair labor practices that interfere with the election processes and tend to preclude the holding of a fair election. Thus, an employer can insist that a union go to an election, regardless of his subjective motivation, so long as he is not guilty of misconduct; * * * " (395 U.S. 595, 89 S.Ct. 1930).

12. Awaiting the decision in Gissel, this case was deemed submitted June 17, 1969.

13. Both of these cases involved secret ballot elections, in which the employees were given an opportunity to express their desires as to a collective bargaining agent.

14. It is unnecessary to determine whether an employer would be entitled to rely upon a certification of the state agency if neither the employer nor the agency had any knowledge of any organizational activities by competing unions.

security and dues check-off provisions in the contract between petitioner and the Machinists, all employees were required to join the union and pay dues to the Machinists. In providing for reimbursement of dues by petitioner the Trial Examiner and Board made the conclusory finding that the remedies provided would "effectuate the policies of the Act," the Trial Examiner saying in part: "In order to fully remedy the unfair labor practices found herein, and to establish an atmosphere in which the employees may exercise the right to select or reject a bargaining representative, it will be recommended that the Respondent make whole all employees, present and former, for dues and other moneys unlawfully exacted from them as a result of the aforesaid unlawful agreement * * *."

There is no specific finding that any of the employees suffered any loss or objected to the payment of dues. No distinction was made between those employees who wanted the union and voluntarily agreed to a dues check-off and those whose dues were checked off only because of the requirement of the collective bargaining agreement.[15]

On the other hand, the Examiner and Board found an absence of bad faith on the part of petitioner. It is not a case where the company actively cooperated with the union in carrying out a clearly unlawful contract provision.[16] There is no suggestion of anti-union bias or action. The contract has expired. Throughout the contract period the employees did have union representation, even though it was a minority union at the time of recognition.

This court recognized in N. L. R. B. v. Seine and Line Fishermen's Union, 1967, 374 F.2d 974, 982, cert. den. Biazevich v. N. L. R. B., 389 U.S. 913, 88 S.Ct. 239, 19 L.Ed.2d 261, that under section 10(c) of the Act, the Board "is charged with an extremely broad latitude in fashioning remedies to effectuate the purposes of the Act as a whole. [citation omitted] Whenever possible the Board's order 'should stand unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act'," quoting Virginia Electric & Power Co. v. N. L. R. B., 1943, 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568.

The right of the Board to require reimbursement of dues, however, is not unlimited. Although the Supreme Court has repeatedly recognized the Board's broad discretion as to remedies, it has also made it clear that, "This is not to say that the Board may apply a remedy it has worked out on the basis of its experience, without regard to circumstances with may make its application to a particular situation oppressive and therefore not calculated to effectuate a policy of the Act." N. L. R. B. v. Seven-Up Bottling Co., 1953, 344 U.S. 344, 349, 73 S.Ct. 287, 290, 97 L.Ed. 377.

In reversing an order for dues reimbursement, the court, in N. L. R. B. v. Burke Oldsmobile, Inc., 2 Cir. 1961, 288 F.2d 14, 16, said in part: "Such a provision has been the occasion of much controversy in the courts; it rests upon the theory that if the dues have been exacted by means of a union which gained its authority from some unlawful action of

---

15. See e. g., Morrison-Knudsen Company v. N. L. R. B., 9 Cir. 1960, 276 F.2d 63, 73–77, cert. denied N. L. R. B. v. Hod Carriers, etc., 366 U.S. 910, 81 S.Ct. 1082, 6 L.Ed.2d 233, where the Board had ordered the company and union jointly to reimburse all employees, and this court, reversing in part, drew a distinction between five young athletes who were forced to join the union and pay dues as a condition of employment and the remainder of the employees concern-

ing whom there was no evidence of coercion.

16. The facts here are distinguished from N. L. R. B. v. Campbell Soup Company, 9 Cir. 1967, 378 F.2d 259, where the Board ordered the company and union jointly to reimburse all employees hired within six months for their first month's dues, illegally collected, and initiation fees for those who worked less than 30 days.

the employer, they should be returned to the credit of the employees from whom they ought not to have been exacted. If applied rigidly, that result would follow no matter what acts of the employer mistakenly caused the union to be recognized." The court called attention to the fact that in prior cases in the Second Circuit upholding reimbursement of dues, "non-unionized employees had been subjected to 'coercion in the most literal sense'".

The leading case upholding an order for dues reimbursement, Virginia Electric & Power Co. v. N. L. R. B., supra, was concerned with a company dominated union, the Board having found that the company was "responsible for the creation" of the union "by providing its initial impetus and direction and by contributing support during its critical formative period" ; and that the company "quickly agreed to give its creature closed-shop and check-off privileges 'in order to entrench the (union) among the employees and to insure its financial stability' ". (319 U.S. at 540, 63 S.Ct. at 1218).[17]

The effect of Virginia Electric has been considered in many cases including N. L. R. B. v. United States Steel Corp., 3 Cir. 1960, 278 F.2d 896, 899, cert. den. 366 U.S. 908, 909, 81 S.Ct. 1083, 1084, 6 L.Ed.2d 234, where the court said in part: "In such a situation (employer-domination in the creation of the union) reimbursement is proper because the union is an illegitimate union from the beginning. Its existence is illegal. The dues themselves are the fruits of the unfair labor practice for, in the absence of the unlawful practice, there would have been no union; a fortiori, there would have been no dues paid to it. Reimbursement is simply a way of pulling the unlawful organization up by the roots. An analogous situation is the annulment of a marriage." [18]

In the present case there is no suggestion of company domination of the union or evidence of any act of coercion of the employees, except through the contract provisions for dues check-off. We have found no cases where the Board has required dues reimbursement in a factual situation similar to this case. On the contrary, in International Ladies Garment Workers, supra, there was no provision for dues reimbursement. In upholding the remedy there provided, the Court expressly called attention to the fact that "no penalty is attached to the violation" and continued: "Assuming that an employer in good faith accepts or rejects a union claim of majority status, the validity of his decision may be tested in an unfair labor practice proceeding. If he is found to have erred in extending or withholding recognition, he is subject only to a remedial order requiring him to conform his conduct to the norms set out in the Act, as was the case here. No further penalty results." (366 U.S. at 740, 81 S.Ct. at 1608).[19]

---

17. The Court in a footnote cites 11 cases in five circuits "under varying circumstances and on diverse reasoning" refusing "to enforce Board orders requiring reimbursement of checked-off dues". (319 U.S. at 534, 63 S.Ct. at 1215 n. 1) In the concluding paragraph of the opinion the Court stated that it need not examine the various situations in those cases "or consider hypothetical possibilities. We decide only the case before us and sustain the power of the Board to order reimbursement in full under the circumstances here disclosed". (319 U.S. at 545, 63 S.Ct. at 1220).

18. In an appendix the court cites numerous cases from the several courts of appeal involving the validity of a broad dues-reimbursement order in fact situations other than the type found in Virginia Electric, concluding that the decisions "seem to be hopelessly in conflict". The cases cited include Morrison-Knudsen Co. v. N. L. R. B., supra, n. 15.

19. It is true, as respondent contends, that the Court did not expressly disapprove a provision for dues reimbursement for the reason that the Board had not included this remedy in its order. The language of the Court, however, in calling attention to the fact that no penalty was provided, is significant.

Admittedly this is a close case. While we recognize the broad power of the Board in fashioning remedies, we conclude that under the circumstances of this case, the provision for dues reimbursement is in fact a penalty and can not fairly be said "to effectuate the purposes of the Act".

The order of the Board will be enforced except for the provision for reimbursement of dues. The portion of the order providing for dues reimbursement is set aside.