477 F.2d 66
 82 L.R.R.M. (BNA) 2916, 83 L.R.R.M. (BNA) 2544,
70 Lab.Cas. P 13,512, 71 Lab.Cas. P 13,701
 PLAYSKOOL, INC., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
CHICAGO JOINT BOARD, RETAIL, WHOLESALE AND DEPARTMENT STORE
UNION, AFL-CIO and Retail, Wholesale and
Department Store Union, AFL-CIO, Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 Nos. 72-1186, 72-1195.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 22, 1973.
Decided March 16, 1973.
Rehearing Denied in No. 72-1186 April 23, 1973.
As amended April 25, 1973.
 
 Francis Heisler, Mark L. Schwartzman, Robert C. Claus, John P. Jacoby, Chicago, Ill., for petitioner.
 Marcel Mallet-Prevost, Asst. Gen. Counsel, John D. Burgoyne, Atty., N. L. R. B., Washington, D. C., for respondent.
 Before CASTLE, Senior Circuit Judge, and FAIRCHILD and CUMMINGS, Circuit Judges.
 CASTLE, Senior Circuit Judge.
 
 
 1
 This case raises a much-litigated question as to the application and extension by the National Labor Relations Board of its Midwest Piping doctrine. The Board found that Playskool, Inc. violated Sec. 8(a)(1) and (2) of the National Labor Relations Act, 29 U.S.C. Secs. 158(a)(1) and 158(a)(2) (1970) by recognizing the Retail, Wholesale and Department Store Union (RWDSU) when another union, the United Furniture Workers, was also seeking recognition for the same units of employees. The Board also found that RWDSU violated Sec. 8(b)(1)(A) of the Act by accepting such exclusive recognition. On this appeal Playskool and RWDSU seek review of the Board's order pursuant to Sec. 10(f) of the NLRA; the Board has filed a cross-application for enforcement of its order, which is reported at 195 NLRB No. 89 (1971).
 
 
 2
 Since 1952, the United Furniture Workers of America have attempted to organize employees at certain Playskool plants in the Chicago area. On several occasions during this time, United has demanded that Playskool recognize it as the exclusive representative of these employees and has offered to demonstrate its majority support through a showing of authorization cards. Each time Playskool has insisted upon a Board-conducted representation election instead of a card check, and each time United has lost the resulting election. The last such elections occurred in November and December, 1968, when United mustered 148 votes out of 494 eligible voters, approximately 29.9% of the total. Subsequent to this loss, United has engaged in continued organizational activity at Playskool's Chicago plants, although the extent of both this activity and the company's knowledge of it are disputed in this appeal. At the very least, United has confronted Playskool employees at their plant gates, solicited authorization cards, and held meetings.
 
 
 3
 The Retail, Wholesale and Department Stor Union instituted its own campaign to organize Playskool employees in March, 1969. Utilizing home visits, inside-the-plant campaigning, and organizers who spoke the native Spanish language of certain employees, this union solicited signed cards authorizing RWDSU to bargain on behalf of individual employees. In April, 1969, company supervisors learned of RWDSU's campaign and decided that Playskool would not oppose that union because of its reputation as a "good union" that did not process many grievances or instigate many strikes. Later that month RWDSU requested Playskool to agree to a card check to verify its claim that it represented a majority of Playskool employees. After company approval, the Illinois Department of Labor's Conciliation Service was requested to check RWDSU's cards against a company-prepared list of employees' names, clock numbers and addresses. On the basis of its examination the Conciliation Service announced that RWDSU had obtained valid authorization cards from at least 300 of the 500 employees listed. On May 2, the company and RWDSU executed a recognition agreement; they later agreed to the terms of a collective bargaining contract which contained union security provisions.[1]
 
 
 4
 United filed a complaint against Playskool and RWDSU in June of 1969 which charged the two with violating the NLRA by executing a recognition agreement while United was also trying to obtain such recognition for the same employees. After hearing testimony and reviewing the evidence, the Trial Examiner issued his decision on June 22, 1971 which found no Midwest Piping violation. The Trial Examiner stated that Sec. 8(a)(2) of the Act and the Midwest Piping doctrine could be violated only when an employer recognized one of two competing unions while the rival union raised a "question concerning representation," and that such a "question" was established when the rival union demonstrated (1) that it had obtained a "substantial representation among the employees, normally amounting to 30%," and (2) that it had demanded or requested recognition from the employer. Since United had met neither prerequisite, and since RWDSU had demonstrated that it represented an uncoerced majority of Playskool employees, the Trial Examiner concluded that United had not raised a "question concerning representation," and that consequently Playskool was free to recognize RWDSU.
 
 
 5
 A panel of the National Labor Relations Board overruled the Trial Examiner and found that Playskool and RWDSU had violated the Act by their execution of a recognition agreement when United also sought to obtain recognition from Playskool. The panel disagreed with the Trial Examiner's enumeration of the prerequisites that a rival union must meet to establish a "question concerning representation" and to preclude employer recognition of a competing union after a showing of authorization cards. The Board said:
 
 
 6
 . . . the sole requirement necessary to raise a question concerning representation within the meaning of the Midwest Piping doctrine, as modified by the Board, is that the claim of the rival union must not be clearly unsupportable and lacking in substance.
 
 
 7
 The Board found that United had raised a question concerning representation by obtaining the required minimum of signatures to petition for an election in November and December of 1968, by polling 29.9% in the election, and by soliciting members after the election. The Board also concluded that the card check conducted by the Illinois Conciliation Service was not an "accurate barometer of the employees' sentiments" because United had not participated in the card check and because some employees had evidently signed authorization cards for both RWDSU and United.
 
 
 8
 On this appeal Playskool and RWDSU challenge the findings of the Board on two grounds: (1) substantial evidence does not support its conclusion that United conducted an organization campaign among Playskool employees and notified the company of its continued interest in representing them prior to the execution of the recognition agreement with RWDSU, and (2) as a matter of law, Playskool and RWDSU did not violate the Act because United did not present a substantial representation claim. Our disposition of the second issue renders any decision on the first largely superfluous, for we find that Playskool did not violate the Act by its recognition of RWDSU after an impartial third party had certified that the union represented a majority of Playskool employees.
 
 I. The Applicable Law
 
 9
 Section 8(a)(2) of the National Labor Relations Act, 29 U.S.C. Sec. 158(a)(2) makes it an unfair labor practice for an employer to "dominate or interfere with the formation or administration of any labor organization. . ." A significant application of this statutory language occurred in Midwest Piping and Supply, Inc., 63 N.L.R.B. 1060 (1945), where each of two competing unions presented the employer with a claim that it represented the majority of his employees and each filed a petition for an N.L.R.B. election to determine the issue of majority support. Before the election could be held, one of the unions presented authorization cards to the employer which purportedly proved that the union represented a majority of his employees. The Board found that recognition of this union by the employer amounted to a breach of his duty of neutrality and constituted a violation of Sec. 8(a)(2).
 
 
 10
 As the petitioners correctly represented at oral argument, the Board and the Circuit Courts of Appeals which have reviewed Board decisions have disagreed upon the application and extension of the Midwest Piping doctrine. The Board has held that this doctrine precludes recognition of any union upon the basis of a card showing when another union has raised a "question concerning representation." The Board has not precisely defined the minimum amount of support a union must show to raise such a question,[2] but it has held that an election between two competing unions must be held if the claim of the rival is "not clearly unsupportable and lacking in substance." (See the Board decision in the instant case, reported at 195 N.L. R.B. No. 89.) Nor is it necessary for the rival union to present any claim to the employer that it currently has majority support, for the employer's knowledge of organizing activity is apparently sufficient to raise the question.
 
 
 11
 The courts, on the other hand, have generally refused to find a violation of Sec. 8(a)(2) where an employer has recognized one of two unions competing for exclusive recognition on the basis of a clear demonstration of majority support. N.L.R.B. v. Peter Paul, Inc., 467 F.2d 700 (9th Cir. 1972), Modine Manufacturing Co. v. N.L.R.B., 453 F.2d 292 (8th Cir. 1971), American Bread Co. v. N.L.R.B., 411 F.2d 147 (6th Cir. 1969), Iowa Beef Packers v. N.L.R.B., 331 F.2d 176 (8th Cir. 1964). The courts have reasoned that, in extending recognition to a union on such a showing, the employer has not "coerced or interfered with" the minority union, but has merely obeyed the duty imposed upon him to recognize the agent which his employees have designated. N.L.R.B. v. Indianapolis Newspapers, Inc., 210 F.2d 501, 503 (7th Cir. 1954). Thus, many decisions recognize that, however important the need to preserve the integrity of the Board's election machinery, courts must protect the right of employees to select and bargain through their own representative without undue delay.[3] Courts have also sought to implement the congressional purpose of promoting labor peace underlying the National Labor Relations Act, and have accepted a majority showing by the victorious union as a means of terminating the instability inherent in a representation contest and preventing a minority union from frustrating the majority will in order to gain campaigning time. N.L.R.B. v. Peter Paul, Inc., 467 F.2d at 702, N.L.R.B. v. Indianapolis Newspapers, Inc., 210 F. 2d at 503, Getman, The Midwest Piping Doctrine: An Examination of the Need for a Reappraisal of Labor Board Dogma, 31 U.Chi.L.Rev. 292, 305 (1964).
 
 
 12
 The courts have, however, recognized exceptions to the right and duty of an employer to recognize one of two competing unions which has demonstrated its support by a majority of employees. Where it can be shown that a union's majority support was due to unlawful coercion or deception, the courts have refused to accept the union's majority status and have held that the employer's recognition constituted a violation of Sec. 8(a)(2). Oil Transport Co. v. N.L.R.B., 440 F.2d 664, 665 (5th Cir. 1971), N.L. R.B. v. Tower Iron Works, Inc., 366 F.2d 189, 191 (1st Cir. 1966), N.L.R.B. v. Air Master Corp., 339 F.2d 553, 557 (3d Cir. 1964).
 
 
 13
 On this appeal, the policy reasons of recognizing the free choice of employees and preserving labor peace lead us to adhere to the view of judicial decisions which have refused to find a violation of the Midwest Piping doctrine where one union has made a valid demonstration of majority support among unrepresented employees. Accordingly, our first inquiry is whether RWDSU represented a majority of Playskool employees at the time it was recognized on May 2; our second inquiry is whether this majority was due to any unlawful activity on the part of Playskool or RWDSU.
 
 II. The Evidence in the Record
 
 14
 The Board has argued that, even if this court should accept the view of previous circuit decisions that a convincing demonstration of majority status by one of two competing unions prior to recognition of that union precludes the finding of an 8(a)(2) violation, the evidence fails to show that RWDSU had the support of a majority of Playskool employees. It contends that (1) the union could not prove at the time of the Board hearing which cards it had given to the Illinois Conciliation Service and whether these cards were valid, and (2) authorization cards solicited in an inter-union representation contest are inherently unreliable because of the pressure upon employees to sign such cards for more than one union.
 
 
 15
 The record indicates that, pursuant to their agreement for a card check by the Illinois Conciliation Service, Playskool submitted a list of the names of 500 employees and RWDSU produced in excess of 300 authorization cards. On May 2, 1969 the Conciliation Service announced that RWDSU had proven its majority support through at least 300 valid cards. After this card check, the union commingled the cards with other undated cards at its offices. When the Board attempted to enforce a subpoena for these cards one year later, the union could only produce 347 cards which it believed that it had submitted to the Conciliation Service.
 
 
 16
 The Trial Examiner found that the General Counsel had the burden of showing that RWDSU did not in fact submit 300 valid cards to the Illinois Conciliation Service, and that he had not met this burden. Although the Trial Examiner found that some of the 347 cards had been backdated and that the signatures on others had been forged, he concluded that at least 296 of them were valid and that this number supported the earlier determination of RWDSU's majority status by the Conciliation Service.[4]
 
 
 17
 The Board found that the forgery of signatures and the commingling of cards after the card check made it "impossible to determine at this time whether or not the RWDSU did, in fact, represent a majority on May 2, when it was accorded recognition by Playskool." These facts, together with its belief that authorization cards obtained during an inter-union campaign are unreliable, led it to conclude that the May 2 card check did not establish RWDSU's majority status.
 
 
 18
 Our disagreement with the Board's decision rests on legal and evidentiary grounds. There is no dispute that the Illinois Conciliation Service-an impartial body with some expertise in labor representation matters-certified to Playskool that RWDSU represented a majority of its employees on May 2, 1969. The record suggests no reason why Playskool should have doubted this finding at that time; nor did the Board cite any proof in its opinion that such a majority did not exist at that time. We believe that if the Board wished to establish that RWDSU had presented an insufficient number of valid cards on May 2, 1969 or that the cards were invalid because some RWDSU supporters had also signed United authorization cards, it had the burden of proving these facts. Modine Manufacturing Co. v. N.L.R.B., 453 F.2d 292, 296 (8th Cir. 1971); see also International Ladies Garment Workers Union v. N.L.R.B., 366 U.S. 731, 739-740, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961); Intalco Aluminum Corp. v. N.L.R.B., 417 F.2d 36 (9th Cir. 1969).[5] But substantial evidence does not support the Board's refusal to find that RWDSU had majority support from Playskool employees on May 2, 1969. No witness testified that RWDSU had less than 300 cards, and, despite some deficiencies in the list of employee names which the Trial Examiner found insubstantial, the Board has not contended that the company had significantly more than 500 employees. There is some evidence that both unions were guilty of forging and backdating authorization cards.[6] We do not condone or accept such despicable conduct, and we recognize that evidence of such alteration should prevent any forged card from being counted for determining a union's majority support. But substantial evidence does not support any conclusion or inference that a sufficient number of cards presented by RWDSU were altered or were signed by people who also signed United cards so that it appears that RWDSU represented less than a majority of Playskool employees when it entered into the recognition agreement on May 2, 1969. Accordingly, Playskool was justified in concluding that United was "no genuine contender" and that no real "question concerning representation" existed. St. Louis Independent Packing Co. v. N.L.R.B., 291 F. 2d 700, 704 (7th Cir. 1961), Cleaver-Brooks Mfg. Corp. v. N.L.R.B., 264 F.2d 637, 642 (7th Cir.), cert. denied, 361 U. S. 817, 80 S.Ct. 58, 4 L.Ed.2d 63 (1959), N.L.R.B. v. Indianapolis Newspapers, Inc., 210 F.2d 501, 503 (7th Cir. 1954).
 
 
 19
 The Board has also argued that, even if this court should find that RWDSU had possessed a card majority on May 2, 1969, Playskool's recognition was invalid because of the partiality Playskool demonstrated toward RWDSU and the deception it practiced upon United. The record shows that Playskool had vigorously opposed United's attempts to solicit support in prior years, but did not oppose RWDSU's campaign. We find, as did the Trial Examiner, that Playskool was within its rights in engaging in such differential treatment and that Sec. 8(c) of the Act allowed it some freedom in expressing its opinions about various unions to its employees. Coppus Engineering Corp. v. N.L.R.B., 240 F.2d 564, 571 (1st Cir. 1957). The record also shows that Playskool notified the Illinois Conciliation Service in arranging the card check that "no other union, at this time has claimed to represent" its employees. The Board argues that Playskool's failure both to notify the Conciliation Service of United's organizing activities and to insure United's participation in the card check prevented "a reliable resolution of the two unions' conflicting representation claims." Although we agree that the better practice would have been to attempt to obtain United's participation in the May 2 card check, we do not think United's absence tainted Playskool's recognition of RWDSU in this case. In telling the Conciliation Service that no union other than RWDSU had claimed to represent its employees at that time, Playskool was making a mere statement of fact, for United at that time had made no claim that it had either maintained or increased the 29.9% support it received in the 1968 elections. It is true that United could not obtain another Board-conducted election until November or December, 1969, and that it did not know whether Playskool would recognize RWDSU through an authorization card check.[7] But these are the risks which United assumed by petitioning for the 1968 elections and which it could overcome only by attempting to obtain more authorization cards than RWDSU to prevent its recognition before another election could be held. We perceive in Sec. 9(c)(3) a congressional attempt to reduce the instability inherent in labor campaigning by limiting the frequency of representation elections. The Board, however, is attempting to use Sec. 9(c)(3) in this case as an excuse of United's lethargy in securing authorization cards and for its failure to present a formal claim to Playskool that it wished to represent the company's employees. In effect, the Board's approach would prolong the instability of a campaign struggle between two unions in such a situation throughout the one year hiatus between elections until another election could be held. We decline to accept such a result and hold that Playskool was correct in signalling an end to the inter-union campaign by recognizing RWDSU on May 2, 1969. N.L.R.B. v. Indianapolis Newspapers, Inc., 210 F.2d 501, 503 (7th Cir. 1954).
 
 
 20
 We conclude, therefore, that Playskool and RWDSU were not guilty of interfering with the free choice of Playskool employees by execution of their recognition agreement, but were merely recognizing the employees' choice of a bargaining representative. We deny enforcement of the Board's order. Since the Board's opinion did not reach the question of whether Playskool violated the proviso to Sec. 8(a)(3) of the Act by not allowing newly-hired employees a 30-day period in which to join RWDSU, we remand this case to the Board for further consideration of this issue.
 
 
 21
 Enforcement denied.
 
 
 22
 FAIRCHILD, Circuit Judge (dissenting).
 
 
 23
 With all respect, I am unable to excuse the employer's failure to disclose to the Illinois Conciliation Service the substantial, and continuing interest of and support for United. Under the circumstances nondisclosure must have been purposeful. This impropriety colors and combines with the other ways in which the employer sought to smooth the path for the union it admittedly preferred. Together I think they support the conclusion that the employer unfairly contributed to and could not rely upon the attainment by the Retail Union of apparent majority status.
 
 
 
 [1]
 The Board found that at least one employee quit her job in order to avoid paying dues to RWDSU and held that the company violated section 8(a)(3) of the Act by threatening her with dismissal for failing to pay such dues. The Board reasoned that, since the recognition of RWDSU was illegal, any contract negotiated with RWDSU was also illegal. The propriety of the Board's finding of the 8(a)(3) violation, then, depends upon whether the recognition of RWDSU was valid under the Midwest Piping doctrine
 
 
 [2]
 The Board requires a showing of support by 30% of the employees in a bargaining unit to establish a "question of representation" for invoking Board election procedures pursuant to Sec. 9(c)(1) of the Act. But in American Bread Co., 179 N.L.R.B. 85, 88 (1968), the Board intimated that the production of one authorization card by a rival union might be sufficient to raise a question concerning representation within the meaning of the Midwest Piping doctrine
 
 
 [3]
 The courts, then, usually take a different initial approach than does the Board. The Board looks first to the support held by the minority union and finds a "question concerning representation" if the claim of that union is "not clearly unsupportable"; the courts look first to the support held by the majority union and find that no "question concerning representation" exists if that union has the validlyobtained support of an employee majority and the rival union is thus shown to be "no genuine contender."
 
 
 [4]
 Among the 347 cards that RWDSU submitted in response to the subpoena, the Trial Examiner found that at least thirtyeight were signed after the card check had been conducted, four contained unauthorized signatures, and seven were mailed too late for the union to receive in time for the card check
 
 
 [5]
 In Intalaco Aluminum, the Board sustained this burden of proof by establishing that the recognized union's apparent card majority had been destroyed by employee defections. In the instant case the Board made no such attempt to attack the validity of the RWDSU card majority, even though it could compare the 296 cards which the Trial Examiner found were obtained by RWDSU prior to May 2, 1969 with the cards allegedly solicited by United
 We do not accept the Board's reading of St. Louis Independent Packing Co. v. N.L.R.B., 291 F.2d 700 (7th Cir. 1961), to place the burden of proof upon the employer to show that the union be recognized had majority support once the Board has proven that a "question concerning representation" existed. St. Louis Packing involved a different factual situation where an employer continued to recognize an incumbent union that had made no acceptable showing of current support when an outside union had successfully petitioned for a Board-conducted election.
 We express no opinion in this case whether every extension of recognition to a union on the basis of a valid, uncoerced majority showing will preclude the finding of a Sec. 8(a)(2) violation, no matter what support the minority union has obtained. Different factual, legal and policy considerations may be involved in such cases.
 
 
 [6]
 Petitioners argue persuasively in their brief that of the more than 100 cards which United presented to the Board to demonstrate its support among Playskool employees, more than half were suspect because they contained altered dates, forged signatures, and erroneous corroborating information
 
 
 [7]
 Section 9(c)(3) of the Act provides:
 No election shall be directed in any bargaining unit or any subdivision within which in the preceding twelve-month period, a valid election shall have been held. . . .
 Whenever United had offered to prove its majority support through a showing of authorization cards prior to the 1968 elections, Playskool had refused the offer and had insisted on a Board-conducted election.