**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**UNIT TRAIN COAL SALES, INC., Respondent.**

**No. 79–1145.**

United States Court of Appeals, Sixth Circuit.

Argued Oct. 13, 1980.

Decided Dec. 4, 1980.

Elliott Moore, Susan Williams, Steven Fetter, William R. Stewart, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., Emil Farkas, Director, Region 9, N.L. R.B., Cincinnati, Ohio, for petitioner.

Frank E. Specht, Smith, Currie & Hancock, Atlanta, Ga., for respondent.

Before WEICK, LIVELY and BROWN, Circuit Judges.

LIVELY, Circuit Judge.

The question in this case is whether Unit Train Coal Sales, Inc. (Unit Train) violated the National Labor Relations Act, as amended, 29 U.S.C. § 151 *et seq.*, (the Act) by granting recognition to a union which had not been validly designated as their representative by a majority of its employees.[1] The National Labor Relations Board found that Unit Train did violate the Act by recognizing the Southern Labor Union (SLU) as exclusive bargaining agent for the six Unit Train employees engaged in operating a coal tipple in Laurel County, Kentucky. The decisions of the Board are reported at 234 NLRB No. 187 and 234 NLRB No. 187A (1978). The case is before this court on application of the Board, pursuant to section 10(e) of the Act, 29 U.S.C. § 160(e), for enforcement of its order.

Prior to July 1, 1975 McDowell Energy Corporation and a predecessor, Medlin Coal Company, operated a strip mine in Laurel County, Kentucky. This operation employed 30 to 40 miners. The United Mine Workers of America (UMW) began an organizational campaign among the Medlin miners in February 1975. On petition of the UMW an election was scheduled for June 12, 1975. The bargaining unit certified by the Board consisted of all production and maintenance employees engaged in strip mining, but specifically excluded six employees who were engaged in construction of a coal tipple near the Medlin mine. Prior to the date of the election, McDowell purchased the Medlin operation and became the employer of the strip miners and the tipple workers. After completion of construction of the tipple, McDowell retained the six tipple employees to operate the tipple.

Unfair labor practices charges had been filed during the organizational drive, and several ballots were challenged at the June 12th election. A consolidated hearing was held on these issues, resulting in a ruling that the challenged ballots should be counted. This decision was affirmed by the

---

1. Specifically, such recognition violates section 8(a)(2) of the Act, 29 U.S.C. § 158(a)(2).

Board on June 21, 1976. When these ballots were opened and counted, the UMW was found to have won the election. On July 15, 1976 the Board certified the UMW as the collective bargaining representative of McDowell's strip mining production and maintenance employees. Pending the outcome of the consolidated proceedings, on May 13 and 14, 1976, three of the six McDowell tipple employees signed authorization cards designating the UMW as their representative. Between May 14 and July 1, 1976 these employees attended either two or three meetings with UMW representatives and McDowell strip miners.

On July 1, 1976 Unit Train purchased the tipple from McDowell. All six employees were retained at the same wages they were paid by McDowell. Unit Train did not purchase any of McDowell's mining properties or employ any of its miners. On July 14, 1976 two representatives of the SLU went to the Unit Train tipple for the purpose of organizing the tipple employees. They obtained signatures on authorization cards designating the SLU as exclusive bargaining representative of five of the six employees of Unit Train. Two of these five were employees who had signed UMW cards while working for McDowell. The next day the SLU representatives presented the cards to the general manager of Unit Train, who extended recognition to the union. Negotiations began immediately and by the evening of July 15, 1976 an agreement was reached. Throughout the day as negotiations progressed, various proposals were presented to the six employees for their acceptance or rejection. The collective bargaining agreement was signed by all six employees. The agreement contained a union security clause and provided for dues check–off.

It was also on July 15, 1976 that the Board finally certified the UMW as exclusive representative of the production and maintenance workers at the McDowell strip mine. On July 19th the UMW filed a petition with the Board to clarify the status of the tipple employees. However, the clarification petition named McDowell rather than Unit Train as the employer of the tipple workers. The complaint in the present case was based on a charge filed by the UMW.

The Board adopted the decision of the administrative law judge (ALJ) that the ambiguity created by the fact of two tipple employees having signed authorization cards for both unions precluded a finding that these employees had made an unequivocal choice of either union. Discarding the SLU cards of the two tipple employees who had also signed UMW cards left only three adherents to the SLU, less than the majority required for recognition. The ALJ found no coercion or misrepresentations by representatives of either the UMW or the SLU. He also found that there was no evidence that Unit Train had any knowledge of the UMW's interest in, or attempts to organize the tipple workers and that Unit Train acted in good faith in granting recognition to the SLU. The UMW never made a demand on Unit Train for recognition.

In seeking enforcement of its order the Board argues that the ALJ correctly applied the "dual card" rule to the facts of this case. That rule, first applied by the Board in *Harry Stein and Arthur Calder*, 46 NLRB No. 21 (1942), requires the exclusion of authorization cards of employees who designate two or more competing unions as their representative. The ALJ recognized that the dual card rule is not absolute and that one card may be treated as a valid designation if there is convincing evidence that the employee has made a choice of one union over the other(s) at the time that union is granted recognition by the employer. In the present case the ALJ found that the signatures of the two employees on authorization cards of the two unions created an ambiguity, though the cards were unambiguous on their faces. Since the SLU cards were signed at a later date than the UMW cards, the ALJ held that the SLU cards could not be counted in determining that union's status unless the employees had repudiated their earlier designations of the UMW.

Both tipple employees who had signed two union cards testified at the hearing concerning the events surrounding the signings. From this evidence it seems clear that the tipple employees who signed the UMW cards in May assumed they would become part of the McDowell units which then included only production and maintenance workers at the mine itself. It is equally clear that these employees were somewhat confused about their status when they signed the SLU cards on July 14th. At the time of signing they asked the SLU representatives what effect their signing would have on their previous indication of a preference for the UMW. Shortly thereafter they sought out the SLU representatives and asked to have their cards returned. After further discussions with the SLU representatives, both employees decided not to take their cards back. One testified that they were uncertain at first, but decided later to let the representatives keep the SLU cards. The other employee testified that when the two returned to retrieve their cards they "got talked back out of it." This same witness testified as follows on his subjective intent when signing the two cards:

Q. (By Mr. Keenan) Did you intend thereby [signing the UMW CARD] to have the Mine Workers represent you?

A. Yes, Sir.

Q. You had asked the Southern Labor Union man for your card back on one occasion, is that correct?

\* \* \* \* \* \*

A. Yes, Sir.

Q. (By Mr. Specht) Mr. Mills, Mr. Keenan just asked you whether you intended the Mine Workers to represent you when you signed the Mine Workers card, did you intend the Southern Labor Union to represent you when you signed the card?

A. Yes, Sir.

\* \* \* \* \* \*

JUDGE BRANDON: What persuaded you not to go through with your request to seek your SLU card back? Why did you not continue to want your Southern Labor Union Card back?

A. Well, they commenced to tell us that we were no part of the Mine Workers that we were Unit Train and that they would be glad to help us if they could keep the card. Maybe they get us a raise. But they were not going to promise us one. All they were going to do was negotiate with the company. I asked them, "What if we couldn't get a raise?" He said, "Well we can't strike. We will have to keep just asking them until we do get you all a raise."

JUDGE BRANDON: And thereafter, were you satisfied with that response?

WITNESS: Yes.

The Board contends that substantial evidence supports the finding of the ALJ that neither the objective nor the subjective evidence demonstrates a repudiation of the UMW cards by the two tipple employees. Under the circumstances of this case, we do not believe "repudiation" provided the proper test for determining the question of whether the SLU represented a majority of the tipple workers. When the workers signed the UMW cards they were employees of McDowell, but were excluded from the bargaining unit. If they had remained employees of McDowell and desired union representation, the UMW was their logical choice since it was the representative of the related McDowell strip mine employees. However, after July 1, 1976 these employees had no relation to McDowell or its employees. Though the three tipple employees who signed UMW cards attended several meetings between May 14 and July 1, 1976, the UMW did nothing to seek their inclusion in the McDowell unit until July 19, 1976. On that date the UMW did not seek recognition from the employer of the tipple workers. Instead it filed a petition for clarification with respect only to their former employer. Under these circumstances we do not believe a repudiation of the UMW cards was required.

Rather than one of repudiation, the question is whether the two employees had made a clear choice in favor of the SLU at the time Unit Train extended recognition. If they had, then the SLU had a majority and Unit Train did not violate the Act by recognizing it. The purpose of section 8(a)(2) is to make certain that an employer does not interfere with the right of employees to select their representatives on the basis of majority support. The Board argues that the dual cards in the present case indicate shifting sentiments rather than a clear and unambiguous selection of a bargaining representative. Particular reliance is placed on the testimony of one of the dual card signers that "I didn't know what I was doing."

While the two employees testified to some indecision at the beginning of their contact with the SLU representatives, the evidence is clear that at the conclusion of their conversations with those representatives on July 14, 1976 the two signers of dual cards had determined to stay with their designation of the SLU as to their exclusive bargaining representative. There was no evidence of any later change in this decision. This was the situation on the morning of July 15th when Unit Train extended recognition to the SLU. The conduct of the two dual card signers on July 15th of participating, along with the other four tipple workers, in negotiating the actual terms of the agreement, and signing it when completed, is evidence that any prior uncertainty had been resolved.

We have found no case where the dual card rule has been applied in situations where two or more unions sought to represent employees of different employers in different bargaining units. The typical case involves competition among unions for employees of a single employer who belong to a single bargaining unit. *See NLRB v. Atlas Lumber Co.*, 611 F.2d 26 (3d Cir. 1979); *NLRB v. Hi–Temp, Inc.*, 503 F.2d 583 (7th Cir. 1974); *Modine Manufacturing Co. v. NLRB*, 453 F.2d 292 (8th Cir. 1971); *Intalco Aluminum Corp. v. NLRB*, 417 F.2d 36 (9th Cir. 1969); *Crest Containers Corp.*, 223 NLRB No. 110 (1976); *Wavecrest Home for Adults*, 217 NLRB No. 47 (1975); *Harry Stein and Arthur Calder, supra.*

Unit Train urges us to hold that the dual card rule does not apply unless a single employer and a single bargaining unit are the subject of competing union efforts. So long as the rule is not applied mechanically or treated as conclusively requiring that all dual cards be excluded in determining whether a union has majority support, it may be applied to successorship cases as well as to those involving a single employer and a single unit. However, changes such as those which occurred in the present case between May 14 and July 14, 1976 require particularly careful consideration of the different circumstances which surrounded the signing of the two sets of cards. Based on the record as a whole we are convinced that a majority of the tipple workers had made a clear designation of the SLU as their exclusive bargaining representative at the time Unit Train recognized the SLU on July 15, 1976. The finding of the ALJ to the contrary, adopted by the Board, is not supported by substantial evidence. *Compare NLRB v. Atlas Lumber Co., supra; Wavecrest Home for Adults, supra.*

Enforcement of the Board's order is denied.