735 F.2d 1384
 116 L.R.R.M. (BNA) 2291, 236 U.S.App.D.C. 353,
101 Lab.Cas. P 11,057
 LOCAL 1814, INTERNATIONAL LONGSHOREMEN'S ASSOCIATION,
AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
JACKSON ENGINEERING COMPANY, INC., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 Nos. 83-1113, 83-1117.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 10, 1983.
Decided May 15, 1984.
As Amended May 21 and
July 20, 1984.
 
 Petition for Review of an Order of the National Labor Relations Board and Cross-Application for Enforcement.
 James M. Altman, New York City, with whom David Jaffe, New York City, was on brief, for petitioner in No. 83-1113. Howard Schulman, New York City, also entered an appearance for petitioner.
 Andrew E. Zelman, New York City, with whom Ellen R. Mandelbaum, New York City, was on brief, for petitioner in No. 83-1117.
 Allison W. Brown, Jr., Atty., N.L.R.B., Washington, D.C., with whom Elliott Moore, Deputy Associate General Counsel, Washington, D.C., was on brief, for respondent in Nos. 83-1113 and 83-1117.
 Before WILKEY and WALD, Circuit Judges, and MacKINNON, Senior Circuit Judge.
 Opinion for the Court filed by Senior Circuit Judge MacKINNON.
 Dissenting opinion filed by Circuit Judge WALD.
 MacKINNON, Senior Circuit Judge:
 
 
 1
 This is a truly stark case of corruption in labor-management relations. Presented to this Court are legal questions of considerable importance and some novelty: the responsibility of a union that obtains a union shop agreement from an employer as part of a corrupt agreement to pay the union's highest officers to steer work to the employer from other businesses, and the authority of the National Labor Relations Board ("NLRB") to remedy the effects of such unlawful concealed assistance. Both Jackson Engineering Co., Inc. ("Jackson," or the "Company," or the "Employer"), and Local 1814 of the International Longshoremen's Association, AFL-CIO ("Local 1814" or the "Union") petition to reverse the Board's decision.
 
 
 2
 In 1975, the president of Jackson struck a deal with the two highest officials of the Union: the Company would welcome the Union's representation of Jackson's employees if the Union would steer business to the Employer. In addition to extending their Union's representation and authority, the Union officials were to receive a ten percent cash kickback for the business that Local 1814 referred to Jackson. As all parties are agreed, the execution of this agreement over the next few years was a blatant violation of the anti-bribery provision of the National Labor Relations Act ("NLRA"), 29 U.S.C. Sec. 186 (1976).
 
 
 3
 Petitioners seek review of the NLRB's order holding that the kickback arrangement, involving as it did the contribution of support by the Employer to the Union, constituted unfair labor practices on the part of both the Employer and the Union.[1] The Board ordered petitioners to cease and desist from such actions, and further ordered Jackson to withdraw its voluntary recognition of Local 1814 as the exclusive collective bargaining representative of Jackson's employees until the Union was certified by the Board, that the current collective bargaining agreement be abrogated, and that Jackson and Local 1814 jointly reimburse Jackson's employees for all union dues and related membership fees paid under the union security clause in the 1979 collective bargaining agreement.
 
 
 4
 Petitioners' first objection to the Board's decision is that the illegal acts of the Union's officers are not attributable to the Union itself, and thus that neither the Union nor the Employer Jackson committed an unfair labor practice. We disagree. Local 1814 was properly held responsible for these acts of its highest officers--actions closely related to the conduct of the Union's business, which would foreseeably yield benefits to the Union itself, and which did in fact yield such benefits.
 
 
 5
 Petitioners further contend that the Board lacked authority to take affirmative remedial steps against the Union and the Employer because the Union local always represented an uncoerced majority of the Jackson employees. As far as this Court is aware, the NLRB has never before applied such affirmative remedies to a case of concealed unlawful assistance by an employer to a union. In that sense, this is a case of first impression. This Court recognizes, however, that the fashioning of remedies in the field of labor relations frequently calls for flexible application of familiar statutory policies to novel factual situations, and that the Board possesses broad discretion in the matching of remedies to wrongs. Cognizant of such administrative discretion, and attentive to the central policy of the NLRA--to allow workers free exercise of their rights to bargain collectively--we rule that the remedies ordered by the Board bear a reasonable relation to the violations found. Where corruption is endemic to the relations between an employer and union, the Board is justified in requiring a fresh start under which employees may freely designate a collective bargaining representative of their choice.
 
 I. FACTUAL BACKGROUND
 
 6
 The facts of this case indicate the existence of a deliberate, flagrant, and very substantial kickback scheme between Jackson and Local 1814. Those facts are extensive but deserve detailed attention: they provide the basis both for holding the Union responsible for the conduct of its officers, and for the authority of the Board to order the remedies that it did.
 
 A. The Origin of the Kickback Arrangement
 
 7
 Jackson is a New Jersey corporation performing ship building maintenance, and repair at sites in New Jersey and New York. Jackson began operations in 1948, and until 1975, its employees were not represented by any labor organization. Some time in 1975, Nicholas Seregos, who was at all relevant times the principal owner and president of Jackson, came to the conclusion that his Company's efforts to get business had been hampered by the fact that its work force was not unionized. In particular, Seregos had observed over time that United States flag ships would repeatedly reject his solicitations on the grounds that Jackson was not a union shop. Sonny Montella, an acquaintance of Seregos, suggested to him that he contact Anthony Anastasio, the Secretary-Treasurer and later Executive Vice President of the predecessor of Local 1814 of the International Longshoremen's Association, AFL-CIO ("ILA").[2]
 
 
 8
 Seregos contacted Anastasio at the Union's office and expressed his interest in both obtaining some business for Jackson and unionizing his shop. Anastasio then met with the employees to see if they would be willing to sign up with the Union; the record is silent as to the events of this meeting.
 
 
 9
 Seregos and Anastasio met again sometime shortly before July 11, 1975. Anastasio offered to get Jackson some business in exchange for a kickback of ten percent of the proceeds; Anastasio made it clear to Seregos that he would refer business to Jackson only on the condition that the firm unionized. Seregos agreed to both the kickback arrangement and to unionization of Jackson's workforce.
 
 
 10
 Seregos and Anastasio next met in the Local 1814 office around July 11, 1975. Anastasio told Seregos that he could help get Jackson business from Prudential Lines, a United States flag line, and instructed Seregos to write to a particular officer at Prudential. Seregos' letter to Prudential, dated July 11, 1975, falsely stressed that his firm was a union shop affiliated with Local 1814. Not until September 15, 1975, did Local 1814 actually obtain authorization cards from Jackson's employees. In late September, Seregos, for Jackson, signed a memorandum of understanding with Local 1814, agreeing to recognize the Union. The Company began to check off employees' union dues and forward the funds to the Union.
 
 
 11
 Next, sometime in the fall of 1975, Seregos and Anastasio met with Anthony Scotto, president of Local 1814, at the Union's office. Seregos asked for more work referrals; Anastasio indicated that he could help Jackson get work with United States Shipping Lines. Anastasio then asked how Seregos was going to pay the ten percent kickback on the business. Scotto offered to help Seregos set up a foreign corporation to smooth the arrangement, but Seregos declined the offer. Seregos, Scotto, and Anastasio then signed a collective bargaining agreement--a multi-employer contract covering eleven other employers in the industry--binding Jackson for a period of three years from November 3, 1975.
 
 
 12
 Soon after this meeting, Jackson got work from two shipping lines. Jackson started to receive business from Prudential in September, 1975. In late 1975, after Jackson had begun receiving business from Prudential and United States Shipping Lines, Seregos and Anastasio further discussed the method of payment for the kickbacks, and agreed that Seregos would pay Anastasio in cash.
 
 
 13
 In early 1976, the ten percent payments began; they were made in cash at the Local 1814 office with only Seregos and Anastasio present. For the business referred to Jackson from the two shipping lines for 1976, Seregos paid Anastasio $15,000. The total for 1977 was $16,000.[3] During 1978, the payments totalled $28,700.[4] Throughout this period, Seregos and Anastasio were responsible for administering the collective bargaining agreement between Jackson and Local 1814. Between 1975 and 1979, both Jackson's business and its number of employees--all Local 1814 members--grew considerably. On November 3, 1978, Jackson and Local 1814 agreed to a modified three-year renewal of their collective bargaining agreement; Seregos signed for Jackson, and Anastasio and Joseph Collazzo signed for the Union.
 
 
 14
 B. The Criminal Indictments and Final Kickback Payments
 
 
 15
 In January, 1979, the Grand Jury in the Southern District of New York handed down an indictment against Scotto and Anastasio concerning their acceptance of payments from other employers under contract to Local 1814. Jackson was not included as a defendant in that indictment. In early May, 1979, at the Local 1814 office, Anastasio asked Seregos if there was any money due "against the work." When Seregos balked due to the pending criminal investigation, Anastasio reassured him. Seregos paid Anastasio $4000 on May 8, 1979.
 
 
 16
 Sometime later, Anastasio asked Seregos to contribute to the cost of Scotto's defense against the indictment. When Seregos hesitated, Anastasio asked him to try to help out, and told him that Anastasio and Scotto were having a reception at a hotel and asking others in the industry to contribute to pay Scotto's attorneys' fees. Seregos then paid Anastasio $4000 cash at the Local 1814 office, on July 5, 1979. On July 31, 1979, a superseding indictment was issued, charging Scotto and Anastasio with additional corrupt conduct. In part, the added courts involved the payments from Seregos to Anastasio from 1977-79.[5]
 
 
 17
 After the superseding indictment was filed, Local 1814 removed Anastasio from dealings and negotiations with Jackson, and Jackson removed Seregos from dealings with the Union. Both Anastasio and Scotto, however, were allowed to retain their offices in the Union, and the two were not replaced by elections until almost two years later.
 
 
 18
 Scotto and Anastasio were tried in the Southern District of New York on multiple criminal counts of receiving unlawful labor payments under section 302 of the Taft-Hartley Act, 29 U.S.C. Sec. 186(b);[6] racketeering and conspiracy charges under 18 U.S.C. Sec. 1962(c) and (d); and tax evasion charges under 26 U.S.C. Secs. 7201 & 7206(1). In January of 1980, the jury convicted both defendants. Anastasio was convicted on the Jackson payments, and was sentenced to two years in prison, five years probation, and a $5000 fine. Scotto, who was not indicted on the Jackson payments, was sentenced on other counts to five years in prison, five years probation, and $75,000 in fines. The trial judge also ordered that the two defendants forfeit their offices in the Union. On September 2, 1980, the Second Circuit unanimously affirmed the convictions. See United States v. Scotto, 641 F.2d 47 (2d Cir.1980), cert. denied, 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981). All the time that the federal appeal and defendants' unsuccessful state court actions to retain their offices were pending, Local 1814 allowed Scotto and Anastasio to remain in their respective positions at the head of the Union. The two were not replaced until May, 1981, when new elections were held.
 
 
 19
 C. Renegotiation of the Collective Bargaining Agreement
 
 
 20
 Sometime in late 1978, Jackson began negotiating with Brewer Drydock Co. ("Brewer") for the purchase of a drydock facility on Staten Island. Jackson's business had, up to then, been purely a pierside operation; the drydock operation would be complementary, and was located opposite Jackson's facility in Brooklyn. In early June, 1979, Jackson agreed to purchase Brewer's Staten Island facility, and to take it over on June 15. Brewer's Staten Island employees had been represented by Local 17, Industrial Union of Marine and Shipbuilding Workers of America ("Local 17").[7] When Jackson took over the Staten Island facility, the Company recognized Local 1814 as the representative of its employees there, believing it was obligated to do so.
 
 
 21
 In late June or early July, 1979, Jackson initiated negotiations with Local 1814 to modify their existing collective bargaining agreement. Jackson sought reduction in wages and benefits, claiming that the firm's new ability to handle combination pierside-drydock work would result in more regular work for employees. The Company also asserted that shipyard work brought lower market prices, and that labor costs of shipyard operations were usually lower. After extensive negotiation, involving a number of bargaining sessions, the parties reached a modified collective bargaining agreement on September 15, 1979. The agreement extended the recognition clause to cover the new Staten Island facility, but the Union agreed to reduced wages and regulations in certain benefits for most Jackson employees.[8] The record contains no suggestion as to what, if anything, the Employer gave up in exchange for receiving these concessions from the Union. Scotto and Anastasio did not personally take part in these negotiations, but they remained the highest officials of the Union throughout.
 
 II. PROCEDURAL DEVELOPMENT
 A. Initiation of the Complaint
 
 22
 On September 28, 1979, Local 17 filed unfair labor practice charges against Jackson and Local 1814 with the National Labor Relations Board. As initially filed, the Local 17 complaint was considerably broader than the complaint ultimately brought before Administrative Law Judge (ALJ) Fish.[9] As presented to the ALJ by the General Counsel, the case primarily involved the illegality, under sections 8(a)(1) and (2) and section 8(b)(1)(A) of the NLRA, of the concealed payments from Seregos to Anastasio. In addition, the complaint presented Midwest Piping[10] allegations that Jackson had committed an unfair labor practice against Local 17 by recognizing Local 1814 as the bargaining representative of Jackson's Staten Island employees while a real question of representation existed. These aspects of the complaint were distinct, yet factually related.
 
 
 23
 B. The Decision of the Administrative Law Judge
 
 
 24
 Upon the foregoing facts, the ALJ found both Jackson and Local 1814 guilty of unfair labor practices based on the concealed payments. The judge found that the undisputed evidence indicated that Seregos had made illegal concealed payments to Anastasio, and that Scotto had at least condoned this arrangement. Jackson Engineering Co., Nos. 29-CA-7498, 29-CB-3966 (May 27, 1982) (hereinafter "ALJ Decision") at 24, 28 (JA 292, 315, 319). In addition, the ALJ explicitly found that the evidence before him yielded the conclusion that the kickback arrangement had been agreed to before the execution of the original memorandum and contract between Jackson and Local 1814. Id. at 8-9 (JA 299-300). Based on those facts, the ALJ stated the central question to be:
 
 
 25
 whether the payments were made to a "labor organization", or put another way, whether Anastasio and Scotto were agents of [Local 1814] with respect to this conduct.
 
 
 26
 Id. at 25 (JA 316). To find the answer to this question, the ALJ turned to section 2(13) of the Act, see infra, which he interpreted in turn to refer him to general principles of agency law. Id. at 26 & n. 44 (JA 317).
 
 
 27
 The ALJ found that the concealed payments were related to Anastasio's exercise of his authority to act for the Union, because they were "intimately connected" with the Company's decision to recognize the Union. Id. at 27 & n. 44 (JA 318). Furthermore, the ALJ specifically found that the kickback arrangement had been "supportive of the interests of the Union," in generating more work for members of Local 1814, and more funds for the Union itself. Id. at 28 (JA 319) (emphasis added). The ALJ reasoned that the entire arrangement had been engineered by the Union's highest officials, and in the absence of outright authorization by the Union's membership, which could hardly be expected to be demonstrable concerning illegal concealed acts, no greater degree of responsibility by the Union could possibly be proven. Id. at 28-29 (JA 319-20). All these facts led to the inexorable conclusion that the Employer had provided the Union with illegal assistance in violation of section 8(a)(1) and (2) of the Act, and that the Union had violated section 8(b)(1)(A) of the Act.[11]
 
 
 28
 The remedies ordered by the ALJ were limited to cease-and-desist orders to both the Company and the Union concerning illegal payments, and requirements of posting of notices. ALJ Decision at 44-46 (JA 335-37). The ALJ particularly declined to set aside the parties' bargaining relationship on the basis of the unlawful payments. Id. at 43 (JA 334).
 
 C. The Decision of the Board
 
 29
 The Employer, the Union, and the General Counsel each filed exceptions to the decision of the ALJ. Adopting the underlying facts found by the ALJ, the Board affirmed his decision concerning the unfair labor practices of Jackson and Local 1814 respectively. Thus the Board approved the ALJ's findings that Anastasio and Scotto had acted on behalf of the Union, and that the illicit arrangement had served the Union's interests. The Board disagreed unanimously, however, with the ALJ's conclusion that the concealed payments arrangements did not warrant setting aside the parties' contract of September 15, 1979. Central to the Board's decision were the following findings:
 
 
 30
 [A]t or about the same time [Local 1814 and Jackson] were negotiating midterm contract modifications granting [the Employer] economic concessions, concealed payments involving large sums of money were changing hands. We find that these concurrent actions operated to taint and undermine the bargaining relationship between [the parties] and the contract which was negotiated by them while the payments were being made. Our conclusion in this regard is not affected by the fact that Anastasio, Scotto, and Seregos personally did not engage in the negotiations which led to the modified contract. Although those individuals may not personally have participated, they were, at all material times, [Local 1814's] executive vice president and president and [Jackson's] president, respectively. Under these circumstances, we do not regard their divorce from the actual negotiations to be determinative of this issue.
 
 
 31
 Jackson Engineering Co., Nos. 29-CA-7498, 29-CB-3966, 265 NLRB No. 175, slip op. at 5 (Dec. 28, 1982) (hereinafter "Board Decision") (JA 396, 400) (emphasis added).
 
 
 32
 On this basis, the Board modified the ALJ's remedial order. Id. at 7-12 (JA 402-07). Beyond the original cease-and-desist orders, the Board added remedial provisions ordering Jackson to cease recognition of Local 1814 until the Union was certified by the NLRB, and to cease giving effect to the September, 1979, collective bargaining agreement. Corresponding orders were directed at the Union. Finally, the Employer and Union were ordered jointly and severally to reimburse all of the Jackson employees who joined the Union after the September 19, 1979, collective bargaining agreement became effective, for the total dues and fees paid by those employees during that period. These petitions for review followed.
 
 
 33
 III. UNLAWFUL ASSISTANCE: THE UNION'S RESPONSIBILITY UNDER
 
 AGENCY PRINCIPLES
 
 34
 This case is somewhat novel in that, as was conceded at oral argument, the National Labor Relations Board has seldom if ever sought to use the unfair labor practice provisions of the NLRA to remedy corrupt criminal payments of an employer to a union. Yet the issues in this case all revolve around one central question that is neither unfamiliar nor particularly troublesome: Can the Union fairly be held responsible for the unlawful acts of its highest officers when those acts go to the very heart of the contractual relationship between the Employer and Union?
 
 
 35
 Petitioners' first challenge is directed at the Board's substantive conclusion that the Employer and the Union each committed unfair labor practices, having respectively violated sections 8(a)(1) & (2) and section 8(b)(1)(A) of the NLRA.[12] The premise of this attack is that unless the acceptance of the unlawful payments by Scotto and Anastasio can be attributed to the Union, then neither the Employer nor the Union can be charged with an unfair labor practice. By the same token, petitioners concede that if made to the Union, the concealed payments would constitute the contribution of support and would therefore give rise to violations on the part of both the Employer and Union. See Brief for Petitioner Jackson at 19; Brief for Petitioner Local 1814 at 18. Preliminarily, this Court notes that the decision of the ALJ, whose factual findings the Board adopted, carefully analyzed the evidence concerning the responsibility of Local 1814, and drew reasonable inferences therefrom.
 
 
 36
 In considering petitioners' contentions, we begin with several broad controlling principles. First, the mere fact that particular acts of individuals are criminally punishable does not render the Act's proscription of unfair labor practices inapplicable to a course of conduct. Section 10(a), 29 U.S.C. Sec. 160(a);[13] see Sweater Bee by Banff, Ltd., 197 N.L.R.B. 805, 805 (1972), enforced sub. nom. NLRB v. Suwannee Lumber Manufacturing Co., 467 F.2d 944 (5th Cir.1972), enforced, 486 F.2d 1395 (2d Cir.1973). On the other hand, the unfair labor practices provisions of the NLRA regulate the conduct of employers and labor organizations only--not the acts of individuals as individuals. See International Longshoremen's and Warehousemen's Union (Sunset Line & Twine Co.), 79 N.L.R.B. 1487, 1507 & n. 37 (1948). The question here, as to the alleged unfair labor practices of both Employer and Union, is whether the individual acts can properly be attributed to the Union. See Sunset Line & Twine Co., supra, 79 N.L.R.B. at 1507.
 
 
 37
 To answer this question, we turn to the NLRA, which deals with imputation of responsibility as follows:
 
 
 38
 In determining whether any person[14] is acting as an "agent" of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling.
 
 
 39
 Section 2(13), 29 U.S.C. Sec. 152(13) (1976) (emphasis added). Without more, the plain language of the statute renders entirely ineffectual Local 1814's reliance on the ALJ's conclusion that Anastasio had not been authorized to enter into kickback arrangements with employers. See Brief for Petitioner Local 1814 at 25-26 (quoting ALJ Decision at 27 (JA 318)). Responsibility is not dependent upon actual authorization.
 
 
 40
 Furthermore, the statutory provision yields an affirmative basis for holding the Union responsible for its officers' acceptance of the payments within the context of the kickback scheme: the principles of agency law. Section 2(13) of the Act was added by the Taft-Hartley Act of 1947, 61 Stat. 136 (June 23, 1947). Beyond doubt, the legislative intent of this provision was to make the ordinary law of agency applicable to the attribution of individual acts to both employers and unions. See, e.g., Sunset Line & Twine Co., supra, 79 N.L.R.B. at 1507-08; accord Mullett v. NLRB, 571 F.2d 1292, 1294 (4th Cir.1978); NLRB v. Local 3, IBEW, 467 F.2d 1158, 1159 (2d Cir.1972); NLRB v. International Brotherhood of Boilermakers, Local No. 83, 321 F.2d 807, 810 (8th Cir.1963).[15] Transplantation of ordinary agency law, which arises out of ordinary contract and tort disputes, into the NLRA context necessarily requires sensitivity to the particular circumstances of industrial labor relations. Courts have concluded that under the NLRA, agency principles must be expansively construed, including when questions of union responsibility are presented. See NLRB v. Georgetown Dress Corp., 537 F.2d 1239, 1244 (4th Cir.1976); NLRB v. Urban Telephone Corp., 499 F.2d 239, 243 (7th Cir.1974). In reviewing the Board's determination that Local 1814 was responsible for these acts, this Court recognizes that the existence of an agency relationship is a factual matter, NLRB v. Donkin's Inn, Inc., 532 F.2d 138, 141 (9th Cir.), cert. denied, 429 U.S. 895, 97 S.Ct. 257, 50 L.Ed.2d 179 (1976), which cannot be disturbed if supported by "substantial evidence on the record considered as a whole." Local 349, IBEW v. NLRB, 357 F.2d 579, 580 (D.C.Cir.1965); see NLRB v. Local 815, International Brotherhood of Teamsters, 290 F.2d 99, 104 (2d Cir.1961) (Friendly, J.).
 
 
 41
 The branch of agency law best suited to this case is the "scope of employment" doctrine. Among the most firmly established principles in our law is that a principal may be held responsible for the acts of an agent committed within the scope of employment. See, e.g., American Fur Co. v. United States, 27 U.S. (2 Peters) 358, 364, 7 L.Ed. 450 (1829); United States v. Gooding, 25 U.S. (12 Wheat.) 460, 469-70, 6 L.Ed. 693 (1827) (Story, J.). The scope of employment doctrine has found frequent articulation in the NLRA context. In the seminal case of Sunset Line & Twine Co., the Board recognized that:
 
 
 42
 A principal may be responsible for the act of his agent within the scope of the agent's general authority ... if the principal actually empowered the agent to represent him in the general area within which the agent acted.
 
 
 43
 79 N.L.R.B. at 1509 (footnote omitted) (emphasis added).
 
 
 44
 The Restatement fleshes out the scope of employment doctrine more fully:
 
 
 45
 Conduct of a servant is within the scope of employment if, but only if:
 
 
 46
 (a) it is of the kind he is employed to perform;
 
 
 47
 (b) it occurs substantially within the authorized time and space limits; [and]
 
 
 48
 (c) it is actuated, at least in part, by a purpose to serve the master....
 
 
 49
 Restatement (Second) of Agency, Sec. 228(1) at 504 (1957). The Reporter comments that a showing that an act "tended to accomplish an authorized purpose and was done at an authorized time and place" gives rise to an inference that the act was within the scope of employment. Id. Sec. 228, comment b, at 505. The criminality of an act does not alone prevent it from falling within the scope of employment. Id. Sec. 231, at 512. Most importantly, the acts of an agent motivated partly by self-interest--even where self-interest is the predominant motive--lie within the scope of employment so long as the agent is actuated by the principal's business purposes "to any appreciable extent." Id. Sec. 236 & comment b, at 523-24.
 
 
 50
 Applying these principles to the case at bar, it is readily apparent that Anastasio's dealings with the Employer were within the "general area" of his authority. Furthermore, his entering into the kickback arrangement with Jackson both "tended to accomplish an authorized purpose"--the extension of his Union's membership--and was motivated "to an[ ] appreciable extent" by furtherance of the Union's interests in dues and payments for pension and welfare benefits, and principally, the extension of its representation of longshoremen. According to the record, Anastasio did have actual authority in the general area of representing the Union in dealing with employers; his authority extended to organizing employees, obtaining recognition, and executing and administering collective bargaining agreements with employers (JA at 295, 147). As the ALJ and the Board properly found, Jackson's recognition of Local 1814, and the concommitant extension of the Union's representation and membership, were "intimately connected" with the kickback arrangement and the concealed payments made pursuant thereto. Anastasio made it clear to Seregos at the outset that the kickback arrangement would only be set up if Jackson agreed to recognize Local 1814 as the bargaining representative of its employees. Thus, Anastasio's exercise of his power to steer business to Jackson--a power directly related to and derived from his position within the Union--was directly conditioned on the Employer's recognition of Local 1814. Without question, this was a package deal from the start. Thus the kickback scheme was a means to an authorized end, and the patent illegality of the means is immaterial.[16] The existence of an agency relationship is completed by the fact that Anastasio had dual motivations in the arrangement: his own pecuniary advantage, and advancement of the representational objectives of the Union of which he was the second highest-ranking officer.
 
 
 51
 Local 1814 derived substantial advantages from the unlawful arrangement, and the ALJ so found. See ALJ Decision at 28 (JA 319). In this regard, it is crucial to distinguish the interests of the Union itself from those of the employee members of the Union--who themselves may not have obtained any new job opportunities out of the payment arrangement. The Union benefitted from Jackson's recognition of Local 1814 and the concommitant extension of the Union's representation of ship workers. At the same time, the Union definitely profited from the associated financial inflow of dues and related fees into its treasury and pension fund. Finally, the Union benefitted generally from the extension of its strength and authority on the New Jersey-New York waterfront. Given his position in the Union and experience in representing it, Anastasio must have understood and expected such potential benefits to the Union. The existence of such benefits renders entirely unavailing the reliance of petitioner Local 1814 on the ALJ's separate finding, not here in dispute, that no evidence demonstrated that the Union itself had received any of the money paid by Jackson,[17] and had not received any other tangible benefit. See Brief for Petitioner Local 1814 at 26 (quoting ALJ Decision at 27 (JA 318)).[18]
 
 
 52
 In sum, the agreement between the Union, the Company, and the Union's two principal officers had four interlocking facets: (1) the Company agreed to recognize the Union; (2) the Company by checkoff would pay the Union, for all its employees, their dues, fees, and payments for pension and welfare benefits; (3) the Union would steer, and the Company would receive, ship repair work to the benefit of the Company, its Union members and the Union; and (4) the President and Executive Vice President of the Union would be paid by the Company sums equal to ten percent of the ship repair business that the Company would receive from ship owners whose repair business, because of their subservient relationship to the Union, was subject to Union discretion. It thus appears that the agreement between the Company, the Union, and the Union's principal officers was completely tainted by fraud and corruption from the very beginning.
 
 
 53
 Furthermore, the Union's retention of Anastasio and Scotto in their high controlling offices, long after the grand jury indictments had put Local 1814 on notice of their misdeeds, is tantamount to acquiescence or condonation of their unlawful acts. The last two payments from Jackson were received by Anastasio after the Union had knowledge of the criminal investigation. The continuation of the acceptance of the benefits of the kickback arrangement under such circumstances supports the inference that the Union had prior knowledge of the arrangement and that Anastasio was motivated in part by the Union's interests. Under such circumstances, one might reasonably have expected a truly upright union to have taken some disciplinary action. As the ALJ astutely recognized, it is hardly imaginable that any greater degree of union responsibility could be demonstrated in such a case: the membership certainly cannot formally authorize an arrangement of which it is unaware, and would certainly never directly ratify an illegal arrangement once it had been exposed. Thus, a decision absolving Local 1814 of responsibility for the acceptance by its highest officers of financial contributions would be tantamount to a blanket determination that a union could never be held so responsible under the NLRA. We reject that alternative. We conclude that Anastasio's actual authority over representational matters in general, together with the substantial benefits received by Local 1814 as a result the entire agreement of which the kickback arrangement was an integral part, constitute substantial evidence on the record as a whole, see 29 U.S.C. Sec. 160(f) (1976); Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), in favor of the Board's conclusion that the Union was legally responsible for Anastasio's acts as agent for the Union.
 
 
 54
 Extensive case law under the NLRA concerning agency relationships within unions buttresses our conclusion. In Mullett v. NLRB, 571 F.2d 1292 (4th Cir.1978), the business manager of a union, who had both authority to remove men from a job and responsibility for seeing that union members were hired before outsiders, had tacitly approved members' actions that had led to the unlawful dismissal of a non-member. Notwithstanding the manager's lack of actual authority to take such actions, the Fourth Circuit concluded that the union official's wrongful conduct could be attributed to the union. Id. at 1294. Similarly, in NLRB v. Georgetown Dress Corp., supra, 537 F.2d at 1244-45, the acts of a voluntary in-plant committee that tainted the election atmosphere were held attributable to the union, notwithstanding the absence of authority for those acts. Likewise, where a union dispatcher with general authority to dispatch longshoremen to employers unlawfully discriminated against nonunion casuals, the Ninth Circuit held the union responsible for commission of an unfair labor practice, notwithstanding the fact that the dispatcher's discrimination was contrary to the established practice of the local. NLRB v. International Longshoremen's and Warehousemen's Union, Local 12, 378 F.2d 125 (9th Cir.), cert. denied, 389 U.S. 846, 88 S.Ct. 104, 19 L.Ed.2d 113 (1967).
 
 
 55
 The import of these illustrative cases is clear: where union officials act within the general scope of their actual authority to conduct union business, and where their actions can be understood to further the union's interests, the union is responsible for the officials' unlawful acts. Numerous other decisions provide further support.[19] In comparison to these cases, one particular instance in which the union was held not responsible is quite instructive. In NLRB v. Service Employees International Union, Local 254, 535 F.2d 1335, 1338 (1st Cir.1976), the court held the union responsible for certain acts, but found no violation concerning an isolated act of violence by a union picket, where there was no sign of union acquiescence in, or approbation of, the assault. In contrast to that case, Anastasio's conduct--recurrent acceptance of unlawful assistance from the Employer under an illicit agreement--was calculated and continuous. Local 1814, furthermore, was silent after it was aware of evidence of the misconduct of its officers, continuing to accept the benefits of the illegal agreement, and leaving Scotto and Anastasio in office for many months without taking any steps to discipline or remove the two.
 
 
 56
 The very cases offered by petitioners serve to refute the argument that no agency relationship existed. Not surprisingly, petitioners avoid case law under the NLRA, preferring to focus on general agency law. Even this approach, however, is ultimately unavailing. For instance, petitioners rely on cases in which thefts by employees were not attributed to their employers to create liability. International Distributing Corp. v. American District Telegraph Co., 569 F.2d 136, 139 (D.C.Cir.1977); Bremen State Bank v. Hartford Accident & Indemnity Co., 427 F.2d 425, 428 (7th Cir.1970).[20] In those cases, like that at bar, the employees' job responsibilities give rise to the opportunity for the misdeed. The critical distinction, however, lies in the fact that the employees' acts in the cited cases cannot possibly be understood to further the interests of the employer. Outright thefts by employees confer no benefit whatsoever on the employer, and it would be absurd to maintain that employees were even partially motivated by the employer's interest when they commit such crimes.
 
 
 57
 Further illustration is provided by another case upon which petitioners rely, Melton v. United States, 488 F.Supp. 1066 (D.D.C.1980), in which a government rehabilitation specialist had been bribed by a developer to falsify reports. The government was held not to be responsible under agency principles for the acts of its specialist, because his unlawful acts could not be regarded as furthering the government's interests. Id. at 1073-74. Significantly, the simple question of who ended up with the bribe money was not considered determinative: the totality of the parties' interests were taken into consideration. Id. When the sort of all-embracing approach evident in petitioners' authority is applied to this case, it becomes evident that the Board was correct to conclude that the conduct of Anastasio and Scotto was within the "scope of employment."[21] Their kickback arrangement foreseeably and effectively benefitted the Union and furthered the Union's interests. We conclude that the acceptance of the money--a prohibited form of employer payment and assistance--by the Union's principal officers is properly attributable to Local 1814, and gave rise to a finding that both the Employer and the Union engaged in unfair labor practices.
 
 IV. THE BOARD'S REMEDIAL ACTIONS
 
 58
 Both the Union and Employer challenge the Board's statutory authority to order the remedial measures that it did. The essence of their complaints is that the "remedies punish Local 1814 for conduct beyond its control and conflict with the purposes of the Act." Brief for Petitioner Local 1814 at 31. Recognizing the NLRA's remedial nature, and the Board's considerable remedial discretion, this Court cannot agree that the Board exceeded its authority or abused its discretion in ordering affirmative relief as it did. Viewed pragmatically, the Board, when faced with the egregious pattern of concealed unlawful assistance before it, was justified in ordering a completely fresh start to relations between Jackson and its employees.A. Background: The Board's Remedial Discretion
 
 
 59
 The NLRA vests in the Board broad discretion to remedy unfair labor practices:
 
 
 60
 If ... the Board shall be of the opinion that any person named in the complaint has engaged in ... any such unfair labor practice, then the Board shall state its findings of fact and shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action ... as will effectuate the policies of this chapter ....
 
 
 61
 Section 10(c), 29 U.S.C. Sec. 160(c) (1976) (emphasis added); see also Section 10(a), 29 U.S.C. Sec. 160(a) (1976) ("The Board is empowered ... to prevent any person from engaging in any unfair labor practice ...."). The Supreme Court has consistently recognized the great breadth of discretion given the Board in remedial matters, thus implementing Congress' intention to entrust labor-management relations to a policy-making administrative body:
 
 
 62
 Because the relation of remedy to policy is peculiarly a matter for administrative competence, courts must not enter the allowable area of the Board's discretion and must guard against the danger of sliding unconsciously from the narrow confines of law into the more spacious domain of policy.
 
 
 63
 Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 194, 61 S.Ct. 845, 852, 85 L.Ed. 1271 (1941); see International Association of Machinists, Lodge 35 v. NLRB, 311 U.S. 72, 82, 61 S.Ct. 83, 89, 85 L.Ed. 50 (1940). The Court has also identified the need for judicial deferrence to the specialized expertise of the NLRB, frankly acknowledging that the Board's remedial "conclusions may 'express an intuition of experience which outruns analysis and sums up many unnamed and tangled impressions ....' " NLRB v. Seven-Up Bottling Co., 344 U.S. 344, 348, 73 S.Ct. 287, 289, 97 L.Ed. 377 (1953) (citation omitted).
 
 
 64
 Accordingly, judicial review of Board-ordered remedies has a narrow scope. The reviewing court must satisfy itself that the Board has employed its expertise, and has fulfilled its duty to explain how the proposed remedy furthers the policies of the Act. See Phelps Dodge, supra, 313 U.S. at 196-97, 61 S.Ct. at 853. In addition, the court must ultimately ensure that the selected remedy is rationally related to the purposes asserted by the Board, and does not conflict with any statutory purpose. See Seven-Up Bottling Co., supra, 344 U.S. at 346-48, 73 S.Ct. at 288-89; Consolidated Edison Co. v. NLRB, 305 U.S. 197, 235-36, 59 S.Ct. 206, 219-20, 83 L.Ed. 126 (1938); NLRB v. MacKay Radio & Telegraph Co., 304 U.S. 333, 348, 58 S.Ct. 904, 912, 82 L.Ed. 1381 (1938). Some decisions have spoken of the Act as barring "punitive" rather than remedial measures, but the Supreme Court has made it clear that the punitive remedial distinction is merely a way of restating the underlying question of whether a given remedy furthers, and is in no manner inconsistent with, the purposes of the Act. Seven-Up, supra, 344 U.S. at 348, 73 S.Ct. at 289; Consolidated Edison, supra, 305 U.S. at 235-36, 59 S.Ct. at 219-20. In the remedial context as in others, the central purposes of the Act are the encouragement of collective bargaining and the protection of employees' rights to freedom of association and free choice of bargaining representatives. See 29 U.S.C. Secs. 151, 157 (1976 & Supp. V 1981).
 
 
 65
 This Court's duty is to ascertain whether the remedies ordered by the Board are proximately tailored to the facts of this case. The remedies selected by the Board are virtually routine in large classes of cases, so it is not the novelty of the remedies that should be our concern. Rather, the question is whether these routine remedial measures are appropriate to the violations here presented. Several facts underlying the unfair labor practices in question are of particular significance. First, the corrupt arrangement went back to the very origins of the parties' relations, and actually predated the Employer's recognition of the Union. Second is the extreme degree of collaboration between Jackson and Local 1814: although Local 1814 was not a "company union" in the traditional sense, its ties under the kickback arrangement were very strong. The involved officers of the Union, without being employees, in effect were paid for the services they were able through the strength of the Union in the shipping industry to render to Jackson.
 
 
 66
 Finally, we have the concealment of the unlawful assistance payments in this case. Such payments usually furnish the basis for the criminal prosecution of the recipients, but here they furnish the basis for the unfair labor practices. The more usual unfair labor practice case based on company assistance to the union involves more open management contributions of money or services to the union--assistance of which the employees would presumably be aware. In this case, there is no evidence that Jackson's employees could have known of the kickback arrangement until the issuance of the superseding indictment.
 
 
 67
 Recognizing the broad contours of the NLRA's remedial scheme, and attentive to the peculiar facts of this case, this Court has considered each of the contested remedies ordered by the Board. We find that the Board's decision represents nothing more than a sensible application of routine remedial practices to a slightly unusual case, and that its orders were entirely consistent with the purposes of the Act. The Board's approach is based on holding the Union responsible for its officers' acts and on restoring the employees to the position they would have enjoyed but for the illegal arrangement.
 
 
 68
 B. The Cease-and-Desist Order Directed to the Union
 
 
 69
 Local 1814 contests the Board's order directing the Union to cease and desist from entering an arrangement "where it receives payments from Jackson," and to post a notice declaring that the Union will never again enter into such a scheme. Board Decision at 10, 11 (JA 405, 406). This objection is easily disposed of, for it is little more than a renewal of the argument that Local 1814 cannot be held responsible for the actions of its officers.
 
 
 70
 The Board has specific authority to order cease-and-desist orders to employers and unions, 29 U.S.C. Sec. 160(c), supra, and such orders are the staple of the NLRB's remedial practice. In particular, for instance, the Board has ordered an employer to cease and desist from bribing a union official. See Hollywood-Maxwell, supra, 126 F.2d at 818-19. The proper scope of a cease-and-desist order is determined only by inquiry into whether the Board could reasonably conclude from the evidence that the order was necessary to prevent further violations. See May Department Stores Co. v. NLRB, 326 U.S. 376, 390, 66 S.Ct. 203, 211, 90 L.Ed. 145 (1945). Notwithstanding the Board's plenary authority to issue such orders, the Union maintains that in this case cease-and-desist orders are inappropriate, because they "will not prevent a recurrence of the unfair labor practices the Board found here, since in this case Local 1814 never received any of the money Seregos paid Anastasio." Brief for Petitioner Local 1814 at 51 (emphasis in the original). As the entirety of section III of this opinion demonstrates, supra, the absence of any evidence that the Union received illegal payments is not dispositive of whether the Union was unlawfully assisted. The actions of Anastasio and Scotto are properly attributable to the Union. Local 1814 has the authority and responsibility to control the conduct of its highest officers and is responsible for their acts to the extent hereinbefore set forth. Thus the cease-and-desist orders directed to the Union were the natural concomitant of the Board's substantive findings in the case. The remedy fits the facts. The orders issued to Local 1814 were neither unfair nor misleading. In sum, we find no infirmity in this portion of the Board's order.
 
 
 71
 C. The Board's Order that the Employer Withdraw Recognition of Local 1814 as Exclusive Bargaining Representative of the Employees
 
 
 72
 In addition to the straightforward cease-and-desist orders approved by the ALJ, the Board ordered several affirmative remedies on the part of the two petitioners. The first such remedy consists of the portions of the Board's order compelling the Employer to cease recognizing Local 1814 as the exclusive bargaining representative of its employees until the Union has been certified by the NLRB, and requiring the Union to cease acting as the representative of Jackson's employees. Board Decision at 7, 8, 11 (JA 402, 403, 406). Petitioner Local 1814 attacks this remedy as "punitive," arguing that it "conflicts with [Jackson's] employees' rights under Sec. 7 of the Act, because Local 1814 was the chosen representative of an uncoerced majority of Jackson's employees at all relevant times." Brief for Petitioner Local 1814 at 32; see id. at 34, 38-39.
 
 
 73
 The Board's standard practice in cases involving extensive unlawful assistance of a union is to issue the type of decertification order here presented. See, e.g., NLRB v. American Beef Packers, Inc., 438 F.2d 331 (10th Cir.), cert. denied, 403 U.S. 919, 91 S.Ct. 2232, 29 L.Ed.2d 697 (1971); American Bakery & Confectionary Workers International Union v. NLRB, 379 F.2d 160, 163 (D.C.Cir.1967); Bowman Transportation, Inc., 120 N.L.R.B. 1147, 1151 (1958). The principal remedial issue in this area has revolved around the distinction drawn between "employer domination" and the lesser offense of "employer assistance;" the former has been remedied by complete disestablishment of the union, while the latter has been corrected by the less absolute means of decertification.[22] Under the Board's established remedial practice, the purposes behind a decertification order are clear: to allow the effects of an unfair labor practice to be dissipated, pending the establishment of the majority status of the union in an election free of restraint and coercion. See NLRB v. District 50, UMW, 355 U.S. 453, 459-60, 78 S.Ct. 386, 390, 2 L.Ed.2d 401 (1958). Under such circumstances, the central policy of the NLRA is served--employees are given a true opportunity, after a breathing spell, to choose freely their bargaining representative. See id.
 
 
 74
 In this case, the Board ordered the decertification remedy on the basis of its established practice and of the statutory purposes fulfilled by that practice. See Board Decision at 5 (JA 400). The Board had found unfair labor practices on the part of both the Employer and the Union, the core substances of which were respectively the Employer's concealed assistance of the Union, and the Union's capitulation, through its two principal officers, of its independence and undivided loyalty to those whom it represented. Noting the contract concessions made by the Union during the 1979 renegotiation of the collective bargaining agreement, the Board emphasized that the unfair labor practices had "operated to taint and undermine the bargaining relationship between" the Employer and Union. Id. (emphasis added). That finding was central to the Board's imposition of the decertification remedy as a means of allowing for a fresh start to the labor-management relations of Jackson's employees. As such, it appears to be the real target of petitioners' objections to the affirmative remedies in question. However, we find that the Board's finding of a "taint" was supported by substantial evidence on the record as a whole:[23] the long-standing illicit kickback arrangement went to the very core of the parties' working relationship. The corrupt agreement to provide the unlawful assistance pre-dated the Employer's recognition of Local 1814 by several months, and was a condition imposed by the Union's officials prior to entering into the collective bargaining agreement. The final payments were made even after the indictments, and even as the 1979 negotiations were getting underway. See ALJ Decision at 4-9 (JA 295-300). By necessity, a union represents its membership through its officers, and in this case Local 1814's officers had been thoroughly corrupted. The Union's representation of Jackson's workforce was thereby tainted.
 
 
 75
 In contesting the Board's decertification remedy, petitioners rely heavily on the ALJ's findings that Local 1814 had enjoyed majority status among Jackson's employees. See ALJ Decision at 22, n. 36, 40, 42 (JA 313, 331, 333). Petitioner Jackson observes that the typical employer assistance case in which the NLRB orders decertification involves conduct which assists the union in obtaining majority status. Brief of Petitioner Jackson at 11. The main thrust of this argument is that where majority status has been demonstrated, a decertification order cannot be reasonably imposed because the initial recognition of the union was not flawed in any way. See id. at 12-13. There are two potent responses. First, the Board has the remedial authority and responsibility to apply its discretion to all factual configurations that come before it; issuance of certain remedies is not limited to standard factual situations. Second, the unlawful agreement to provide the assistance in this case was entered into in July, 1975 (JA 295), and predated the September date when a majority of the employees expressed a preference for the Union (JA 296). The evidence thus strongly demonstrates that the kickback arrangement was an integral part of the mutual understanding that initially led Jackson to consent to recognition. The Supreme Court has recognized that the existence of majority status is not necessarily determinative of whether employer assistance has overridden the employees' free choice. See NLRB v. Newport News Co., 308 U.S. 241, 248-51, 60 S.Ct. 203, 207-08, 84 L.Ed. 219 (1939). We conclude that imposition of the decertification remedy here "properly reconcile[s] the objectives of eliminating improper employer interference and preserving the employees' full choice of a bargaining representative." District 50, UMW, supra, 355 U.S. at 461, 78 S.Ct. at 391.[24]
 
 
 76
 Finally, Local 1814 argues that the absence of demonstrable coercion of the Jackson workforce precludes the decertification remedy. Brief for Petitioner Local 1814 at 37-40. This demand for a showing of "coercion" is highly disingenuous, to say the least. In this case, the Board was inherently prevented from introducing outward evidence of coercion because from the very outset the unlawful assistance payments were effectively concealed from Jackson's employees, as from the world at large. Thus petitioner's argument amounts to little more than an assertion that because the Employer and Union succeeded so long and so well in concealing their transgressions, the unfair labor practices found here cannot be remedied. The Board's decertification order saw through this argument. This Court finds a sufficient factual nexus between the underlying facts, the violations found, and the remedy of decertification. The Union has not been irrevocably disestablished: if Local 1814 truly enjoys majority status among Jackson's employees, then the Union will be able to demonstrate its majority status in an election conducted free from the tainted atmosphere that so long pervaded relations between this Employer and Union.
 
 
 77
 D. Abrogation of the 1979 Collective Bargaining Agreement
 
 
 78
 Petitioners next contest the Board orders requiring Local 1814 and Jackson to cease giving effect to the 1979 collective bargaining agreement between the parties--including all dues checkoff cards executed pursuant thereto--until the Union has been certified by the NLRB. Board Decision at 6, 8, 10-11 (JA 401, 403, 405-06). Because the Board provided the employees substantive protection from the Employer disregarding the terms of the contract,[25] the abrogation remedy is essentially only a corollary to the decertification remedy. Like that remedy, abrogation was based on the central finding of the Board, which we endorsed above--that the illegal concealed payments, particularly when viewed together with the contract concessions, had served to "taint and undermine" the parties' bargaining relationship. Concerning the abrogation of the collective bargaining agreement, we affirm the Board's conclusion that in light of the fact that Anastasio and Scotto had remained as officers of the Union, "their divorce from the actual negotiations" was not determinative of whether those negotiations had been tainted. Board Decision at 5 (JA 400).
 
 
 79
 Like the decertification remedy, the abrogation remedy is designed to dissipate the effects of unfair labor practices and to protect employees' statutory rights. In unlawful assistance cases where the violation has had some impact on the contract in question, the abrogation remedy is virtually routine. See, e.g., International Association of Machinists, supra, 311 U.S. at 75, 61 S.Ct. at 86; American Bakery & Confectionary Workers International Union, supra, 379 F.2d at 163; Ditzler Mechanical Contractors, Inc., 259 N.L.R.B. 610, 612-13 (1981); Jeffrey Manufacturing Co., 208 N.L.R.B. 75 (1974); Bisso Towboat Co., 192 N.L.R.B. 885 (1971).
 
 
 80
 In attacking the abrogation remedy, petitioner Jackson argues that "there is simply no connection between the unlawful payments and what has been nullified by the Board." Reply Brief for Petitioner Jackson at 14; see Brief for Petitioner Local 1814 at 44-45. Petitioners rely on the findings of the ALJ that the modified collective bargaining agreement had been the product of hard bargaining. See ALJ Decision at 42 (JA 333). In addition, petitioners assert that the unlawful payments and the contract concessions were not truly contemporaneous, in that the payments ceased shortly before the 1979 contract was executed. See Brief for Petitioner Local 1814 at 42; Reply Brief for Petitioner Jackson at 14. Therefore, they conclude, the 1979 modified contract was not the "fruit" of the illegal assistance, within the sense of Consolidated Edison, supra, 305 U.S. at 236, 238, 59 S.Ct. at 220.
 
 
 81
 We cannot so easily dismiss the Board's conclusion that the illegal assistance was sufficiently proximate to the 1979 negotiations, in both time and practical impact, to support the abrogation remedy. The last illegal payment was made even as the negotiations were getting under way. As we have indicated, the kickback arrangement went to the very heart of the Jackson-Local 1814 relationship through the summer of 1979. Like its highest officers themselves, the Union's representation of the Jackson employees had been thoroughly corrupted. In this context, the fact that Scotto and Anastasio, still the Union's highest officers with no diminution of their internal authority, did not actually take part in the negotiations amounts to a mere formality. The Board has fulfilled its responsibility to tailor the remedy to the violation: it demonstrated with reasonable specificity the impact of the illegal assistance on the parties' bargaining relationship and on the modification negotiations in 1979. Petitioners would simply have the Board ignore the forest for examining the trees. Given the magnitude of the violations presented, the Board's "taint and undermine" finding, as applied to the 1979 modifications, was no great leap. That taint on the agreement warrants abrogation thereof. The Board's order, however, does leave open the possibility that the contract may be reinstated when and if the NLRB certifies the Union.
 
 E. The Reimbursement of Dues
 
 82
 The final contested remedy is the Board's order that the Employer and Union, jointly and severally, reimburse all employees who joined the Union after the 1979 contract for all dues and fees extracted from those employees under the collective bargaining agreement. See Board Decision at 6, 8-9, 11 (JA 401, 403-04, 406). Petitioners contend that reimbursement is unwarranted because there was no showing that employees had been coerced into joining the Union and paying dues, and because the union security clause in the 1979 collective bargaining agreement was entirely legal.[26]
 
 
 83
 The reimbursement remedy is another way of dissipating the effects of unlawful labor practices, and also restores to employees that which was unlawfully taken from them. On these bases, the Board has long ordered repayment of dues where employees, as a requirement of employment, were unlawfully required to support a union. See Virginia Electric and Power Co. v. NLRB, 319 U.S. 533, 539-45, 63 S.Ct. 1214, 1218-20, 87 L.Ed. 1568 (1943). Reimbursement may be ordered when the union is assisted, as well as when it is "dominated." See, e.g., NLRB v. Vernitron Electrical Components, Inc., 548 F.2d 24, 27 (1st Cir.1977); NLRB v. Revere Metal Art Co., 280 F.2d 96, 100-101 (2d Cir.), cert. denied, 364 U.S. 894, 81 S.Ct. 225, 5 L.Ed.2d 189 (1960). In either case, the continued existence of a union security clause may compel union members to financially support a union that has compromised its undivided loyalty to the employees.[27]
 
 
 84
 There is no dispute that the 1979 collective bargaining agreement contained, as had the predecessor agreement, both a union security clause and a dues checkoff provision. Nonetheless, petitioners argue that reimbursement is inappropriate. First, Local 1814 maintains that the case is controlled by the Supreme Court's decision in Local 60, Carpenters v. NLRB, 365 U.S. 651, 81 S.Ct. 875, 6 L.Ed.2d 1 (1961). That case held that reimbursement was punitive when applied to long-time union members, at least in the absence of evidence that those employees had somehow been coerced into joining the union as a condition of employment. Id. at 654-66, 81 S.Ct. at 877-83. The Board's reimbursement order here, however, benefits only employees who joined the union after the 1979 collective bargaining agreement became effective. Thus the incongruency perceived by the Court in Local 60, Carpenters --the reimbursement of longstanding union members, whose membership had not demonstrably been coerced--is absent in this case. Numerous decisions have recognized that reimbursement is entirely proper when applied to employees joining the union after he unlawful assistance, and where a union security clause, that is unlawfully acquired, compels payment of dues. See, e.g., Vernitron, supra, 548 F.2d at 27; NLRB v. Raymond Buick, Inc., 445 F.2d 644, 645 (2d Cir.1971). The Local 60, Carpenters requirement of demonstrable coercion is simply inapplicable.
 
 
 85
 Petitioners next produce a series of related arguments, the common core of which is the objection that the 1979 agreement was not unlawful in any way. Both Local 1814 and Jackson reason that because the union security clause in the 1979 agreement was merely carried over from the preceding agreement, that the 1979 clause was not the result of any unfair labor practice. Brief for Petitioner Local 1814 at 49-50; Brief for Petitioner Jackson at 41. In addition, petitioners appear to treat the Board's application of the reimbursement remedy only to employees joining the Union under the 1979 collective bargaining agreement as some sort of concession that the checkoff of dues was unrelated to the unlawful payments. If the two had truly been related, the argument goes, the Board would have extended reimbursement further back in time. Both arguments miss the mark. Regardless of the preexistence of the union security clause, the Board found that the unlawful assistance, particularly in light of the Union's bargaining concessions, had been severe enough to "taint and undermine" the parties' bargaining relationship that led to the 1979 agreement. In that way, the entirety of the modified collective bargaining agreement, including the union security and dues checkoff clauses, were infected. That being so, reimbursement was appropriately ordered. The Board's decision not to extend reimbursement further back in time[28] was an exercise of remedial discretion, and in no way detracts from the Board's authority to go as far as it did. The Board is not obliged to adopt an all-or-nothing remedial stance. That the Board might have been justified in going back further than it did is not a sound reason to set aside its order limiting reimbursement to more recent payments.
 
 V.
 
 86
 For the foregoing reasons, this Court upholds the Board's decision that both the Employer and Union committed unfair labor practices. The acts of the Union's officials being properly attributable to the Union itself, the illicit kickback arrangement gave rise to violations on the part of both petitioners. The Board's remedies were reasonably designed to dissipate the effects of those violations, and to prevent their recurrence. We deny the petitions and order that the Board's order be enforced in its entirety.[29]
 
 
 87
 Judgment Accordingly.
 
 WALD, Circuit Judge, dissenting:
 
 88
 Although I, like the majority, abhor the corrupt conduct of the union officials in this case, I have considerable difficulty in enforcing the Board's remedial order against the union on the basis of the record before us. As the majority points out, Maj.Op. at 1391, this is apparently the first time in the fifty-year history of the NLRA that the Board has applied the section 8(a)(2) proscription of financial and other support of unions by employers to a scheme of individual corruption involving kickback payments that in no way benefitted the union as an entity.[1] I am not willing to say at this juncture that the Board is not authorized under any circumstances to apply section 8(a)(2) and its decertification remedies to a union so infected by its leaders' corruption that it cannot properly represent its members. But neither am I willing to read the statute as permitting the Board to make this major innovation in the interpretation of the law without any findings or allusions to evidence on the record demonstrating a relationship between the individual officers' corruption and the union's representation of its members. To do so would impermissibly expand the Board's power to intervene in and dissolve collective bargaining relationships vitally affecting the welfare of union members in situations not within the legitimate ambit of section 8(a)(2).
 
 
 89
 The uniqueness of this case of course does not lie in the corrupt scheme recounted in detail by the majority. Kickbacks of precisely this kind motivated Congress to enact as part of the Taft-Hartley Act a special statute, 29 U.S.C. Sec. 186, proscribing the acceptance of payments by union officials from employers and providing for both criminal penalties and various civil remedies for its violation. Indeed the very existence of 29 U.S.C. Sec. 186 strongly suggests to me that Congress never intended section 8(a)(2), a provision designed to deal with the altogether different problem of "company unions," to be applied to kickback schemes like this one.
 
 
 90
 By its terms, section 8(a)(2) proscribes financial or other support to a labor organization. There is absolutely no evidence that any of the kickback money here went into the union coffers or in any other way benefitted the union. ALJ Opinion at 27, J.A. 318. I cannot agree with the majority's attempts to finesse this point by characterizing the payments as simply part of a "package deal" that benefitted the union. The sole basis for the Board's finding of an unfair labor practice was the kickback payments themselves and those payments did not in any way (as far as the record shows) benefit the union. Under the "package deal" theory, the Board could abrogate under section 8(a)(2) virtually any bargaining relationship and any labor contract involving corrupt dealings between the employer and union officials. This would radically expand the Board's power to determine for employees which unions are or are not worthy of their support. The ALJ specifically found that the union here maintained the support of an uncoerced majority, ALJ Op. at 40, J.A. 331. I need not remind this court of the fundamental premise of the National Labor Relations Act that employees should be free to choose their own representatives; we recently rejected a Board decision to issue a bargaining order where the union had not attained majority status because such an order was deemed inconsistent with that premise. Conair Corp. v. NLRB, 721 F.2d 1355 (D.C.Cir.1983); see infra note 2.
 
 
 91
 The use of common law agency principles to substitute for a total lack of evidence that the kickbacks benefitted the union does not work. Obviously, as the ALJ noted, we could not expect the union to ratify the illegal actions of its officers. But that truism does not mean that we should presume that every illegal action taken by a union officer to line his own pockets is done by and for the benefit of the union. Indeed, the common law of agency incorporates the opposite presumption, that an illegal act ordinarily will not be found within the agent's scope of employment. Although there are situations in which the principal is held liable for such conduct, generally where innocent third parties are the direct victims of the agent's illegal conduct, it remains the general rule that "if the employee committing the crime is acting solely for his own benefit, his employer is not liable." Melton v. United States, 488 F.Supp. 1066, 1074 (D.D.C.1980). See also Hoston v. Silbert, 681 F.2d 876, 880 (D.C.Cir.1982) (under D.C. law, "foreseeability must be combined with a purpose to further the employer's interest"); Restatement (Second) of Agency Sec. 235. The solicitation and acceptance of kickback payments here appear in no way to have been motivated by the officials' desire to serve their union. Instead it appears from the evidence that Scotto and Anastasio simply exploited their powerful positions as ILA officials. Indeed, it is odd, in light of the Board's attempt to portray this as a routine application of agency principles to what is unfortunately a familiar set of facts, that we have been cited to no prior Board decision that held a union responsible under principles of agency for its officers' acceptance of illegal kickbacks.
 
 
 92
 The majority, the ALJ and the Board all presume that no direct evidence could be shown--and therefore that none need be shown--to link the kickback payments to the union. But that link is precisely what the statute requires--some proof that the employer provided unlawful support to the union by virtue of the payments--or at least what agency law ordinarily requires--that Scotto and Anastasio, in soliciting and accepting kickbacks, were acting pursuant to a plan entered into for the benefit of or with the approval of the union as an entity. This would for instance be a different case if there were evidence of widespread knowledge and acceptance of the kickback scheme by other union officers or members. Instead we have only the bare fact of an indictment that came down at the very end of the kickback scheme. Whatever our personal views of what action a "truly upright union" would take under the circumstances, Maj.Op. at 1395, there is no evidence at all in this record of knowledge or ratification by other officers or members so as to fill the gaping holes in the Board's application of agency law.
 
 
 93
 This would also be a different case if the Board had found on the basis of substantial evidence that the employer or the union had, by virtue of the kickback payments or otherwise, coerced or restrained employees in their choice of bargaining representative, or that the union had failed to represent the employees adequately. Instead, the ALJ specifically found on the evidence before him that Local 1814 had maintained the support of an uncoerced majority, ALJ Op. at 40, J.A. 331, and had provided the employees with "vigorous and effective representation" in spite of the ongoing kickback scheme. ALJ Op. at 42, J.A. 333. Without pointing to a single piece of evidence undermining these carefully supported findings, the Board concluded that the entire bargaining relationship was "tainted." It proceeded to order a set of section 8(a)(2) remedies, including decertification of the union and abrogation of the collective bargaining agreement, that make sense only in the usual 8(a)(2) case, in which the employer's out front assistance to the union carries with it a threat of coercion to the rank and file and therefore undermines the union's claim of majority status. I point out at the risk of tedium the absence of any precedent for the application of these remedies to a case of direct and secret employer payments to officials, apparently inuring solely to the personal benefit of those individual union officials.
 
 
 94
 If the Board's decision in this case is based on its conclusion that concealed kickback payments of this kind to high union officers are inherently coercive and necessarily taint the bargaining relationship, then the Board has introduced a major innovation in the law of labor relations permitting massive government intervention into collective bargaining relationships in the absence of any evidence of coercion or lack of majority status. At the very least the Board is obligated to acknowledge the significance of this innovative use of the NLRA and to justify it.[2] Here, however, we are presented with no link, logical or factual, between the corrupt kickbacks and the need for a complete abrogation of the entire collective bargaining relationship that the Board, reversing the ALJ, ordered as a remedy.
 
 
 95
 The government has a wide range of remedies and penalties under 29 U.S.C. Sec. 186 that are tailor-made to penalize and rectify the evil of such kickback schemes. Section 8(a)(2) and the traditional remedies for its violation simply do not fit the situation depicted here of corrupt union officers extorting money from the employer solely for their own use. Without proof of any motive to benefit the union or any relationship between their individual greed and the union's activities, I am not convinced that there is a legitimate invocation of section 8(a)(2). However distasteful the misdeeds of these individuals, they do not justify novel remedies that bend the statute out of shape and, in so doing, penalize not the culprits but the union and its members who are, as far as we can tell from this record, only innocent bystanders to the wrongdoing. I respectfully dissent.
 
 
 
 [1]
 Jackson was held to have violated both sections 8(a)(1) & (2) of the Act, which prohibit employer assistance of labor organizations through the contribution of financial or other support; Local 1814 was found in violation of section 8(b)(1)(A) of the Act, which prohibits unions from restraining or coercing employees in the exercise of their statutory rights to bargain collectively through representatives of their own choosing. The full text of these statutory provisions appears supra note 12
 
 
 [2]
 At the time, Anastasio was Secretary-Treasurer of Local 1277, ILA. In March, 1978, Local 1277 and other locals of the ILA merged into Local 1814. All parties agree that Local 1814 is the successor to Local 1277. References to the ILA local will be to "Local 1814." As Secretary-Treasurer, Anastasio was responsible for the administration of contracts for Local 1814 in the ship repair industry. He continued exercising that responsibility after the merger, when he became Executive Vice President, the second highest position in the merged organization
 
 
 [3]
 During 1977, Seregos gave Anastasio $5000 on June 2, $1000 on October 6, $5000 on November 17, and $5000 on December 19
 
 
 [4]
 The 1978 figures and dates were as follows: $5000 on February 28, $5000 on March 23, $5000 on April 10, $5000 on May 15, $3700 on July 3, and $5000 on November 15. These payments were for the business of United States Shipping Lines; Jackson lost Prudential's business in 1978
 
 
 [5]
 Scotto was not indicted for dealings with Seregos or Jackson
 
 
 [6]
 29 U.S.C. Sec. 186(a) & (b) (1976) provides:
 (a) It shall be unlawful for any employer ... to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value--
 (1) to any representative of any of his employees ... or
 (2) to any labor organization, or any officer or employee thereof, which represents, seeks to represent, or would admit to membership, any of the employees of such employer ... or ...
 (4) to any officer or employee of a labor organization ... with intent to influence him in respect to any of his actions, decisions, or duties as a representative of employees or as such officer or employee of such labor organization.
 (b)(1) It shall be unlawful for any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or delivery of any money or other thing of value prohibited by subsection (a) of this section.
 
 
 [7]
 The last collective bargaining agreement between Brewer and Local 17 was to run until August 31, 1981, and contained a clause binding Brewer and its "successors and assigns." All of Brewer's employees, however, had been laid off prior to the June, 1979, sale. During the summer of 1979, officials of Local 17 asserted, without success, that Jackson was bound by the successor clause to recognize Local 17 as the representative of employees at the Staten Island facility. Local 17 did not claim, however, that it represented any of Jackson's employees
 
 
 [8]
 The twenty-five most senior Jackson employees received no reduction in wages or benefits. For the remainder of the workforce, wages and pension and hospitalization benefits were slightly reduced. Holidays, sick days, and jury days were unchanged
 
 
 [9]
 The allegations of the complaint that dropped out of the case before the decision of the ALJ were the Local 17 charge that Jackson violated section 8(a)(5) of the Act by refusing to recognize that union as the successor to Brewer's bargaining obligation; that Jackson violated section 8(a)(3) by discriminatorily refusing to hire former Brewer employees because of their Local 17 membership; and that Local 1814 violated sections 8(b)(1)(A) and (2) by inducing Jackson to refuse to hire those employees. The Regional Director of the NLRB refused to issue a complaint with respect to these charges, and specifically dismissed the section 8(a)(5) charges
 
 
 [10]
 Midwest Piping & Supply Co., 63 N.L.R.B. 1060 (1945), in which the Board held violative of section 8(a)(2) an employer's recognition of one union as the bargaining representative of employees while a real question of representation existed between two rival unions
 
 
 [11]
 The ALJ went on to decide that the Company had not committed Midwest Piping violations by recognizing Local 1814 as the bargaining representative of the employees at Jackson's Staten Island facility. ALJ Decision at 30, 43 (JA 321, 334). In so doing, the ALJ relied on findings that Local 1814 had enjoyed majority status among Jackson's employees, id. at 40 (JA 331), and that the Union had provided those employees with "vigorous and effective representation" throughout the period of concealed payments. Id. at 42 (JA 333)
 
 
 [12]
 The portions of the NLRA under which Jackson was found to have committed unfair labor practices provide:
 It shall be an unfair labor practice for an employer--
 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
 (2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it ....
 Section 8(a)(1) & (2), 29 U.S.C. Sec. 158(a)(1) & (2) (1976).
 Local 1814 was found in violation of the following provision:
 It shall be an unfair labor practice for a labor organization or its agents--
 (1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title ....
 Section 8(b)(1)(A), 29 U.S.C. Sec. 158(b)(1)(A) (1976).
 
 
 [13]
 Section 10(a) of the Act provides:
 The Board is empowered ... to prevent any person from engaging in any unfair labor practice .... This power shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise ....
 29 U.S.C. Sec. 160(a) (1976) (emphasis added). The italicized language of section 10(a) refutes, by itself, the dissent's suggestion that the existence and availability of 29 U.S.C. Sec. 186 forecloses the Board from remedying the kickback scheme here presented as it would any other unfair labor practice.
 
 
 [14]
 Within the NLRA, the term "person" includes individuals, labor organizations, and corporations. Section 2(1), 29 U.S.C. Sec. 152(1) (Supp. V 1981)
 
 
 [15]
 Legislative history reveals that Senator Taft offered the following analysis of section 2(13):
 This restores the law of agency as it has been developed at common law.
 These amendments are criticized in one breath as imposing too harsh a liability upon unions for the acts of their officers or representatives and as too mild with respect to the liability of employers for the acts of their managerial and supervisory personnel. Of course, the definition applies equally in the responsibility imputed to both employers and labor organizations for the acts of their officers or representatives in the scope of their employment.
 It is true that this definition was written to avoid the construction which the Supreme Court in the recent case of United States against United Brotherhood of Carpenters [United Bhd. of Carpenters v. United States, 330 U.S. 395, 67 S.Ct. 775, 91 L.Ed. 973 (1947) ] placed upon section 6 of the Norris-La Guardia Act which exempts organizations from liability for illegal acts committed in labor disputes unless proof of actual instigation, participation, or ratification can be shown. The construction the Supreme Court placed on this special exemption was so broad that Mr. Justice Frankfurter, speaking for the dissenting minority, pointed out that all unions need do in the future to escape liability for the illegal actions of their officers is simply to pass a standing resolution declaiming such responsibility. [330 U.S. at 413, 421, 67 S.Ct. at 785, 788 (Frankfurter, J., dissenting) ] The conferees agreed that the ordinary law of agency should apply to employer and union representatives. Consequently, when a supervisor acting in his capacity as such, engages in intimidating conduct or illegal action with respect to employees or labor organizers his conduct can be imputed to his employer regardless of whether or not the company officials approved or were even aware of his actions. Similarly union business agents or stewards, acting in their capacity of union officers, may make their union guilty of an unfair-labor practice when they engage in conduct made an unfair-labor practice in the bill, even though no formal action has been taken by the union to authorize or approve such conduct.
 
 
 [93]
 Cong.Rec. 6858-59 (June 12, 1947) (emphasis added). Numerous other references in the legislative history of the Taft-Hartley amendments support this interpretation of this provision making basic agency law equally applicable to the attribution of actions to both employers and unions. See, e.g., House Conf.Rept. No. 510, 80th Cong., 1st Sess. 36, 93 Cong.Rec. (House) 6371 (June 4, 1947), U.S.Code Cong.Serv. 1947, 1135; 93 Cong.Rec. (Senate) 6442 (June 5, 1947). It goes almost without saying that if a union is guilty of the unauthorized unfair labor practices of its business agents and stewards, that it is similarly responsible for practices of its president and executive vice president
 
 
 [16]
 Unfair labor practices may often involve conduct that is unlawful in other respects. See supra. Interestingly, there is at least one case in which a court has upheld the Board's conclusion that an employer's bribery of a high union official constituted an unfair labor practice. See NLRB v. Hollywood-Maxwell Co., 126 F.2d 815, 818-19 (9th Cir.1942)
 
 
 [17]
 In United States v. Scotto, supra, 641 F.2d at 51, the Second Circuit noted the existence of some evidence that Scotto had used some of the illegal payments involved in that case for political campaign contributions. The Union might benefit from such payments
 
 
 [18]
 The ALJ's findings that the Union had so benefitted refutes the argument of the dissent that no evidence linked the kickback payments to Local 1814. Likewise, the facts found by the ALJ contradict the dissent's assertion that the Union officers' entering into the kickback arrangement was in no way motivated by a desire to serve the Union. Anastasio's participation in the scheme was directly conditioned on the Employer's recognition of the Union, which conferred benefits on Local 1814. The Union's officers acted both for themselves and for the Union
 
 
 [19]
 See Sheet Metal Workers' Int'l Ass'n v. NLRB, 293 F.2d 141 (D.C.Cir.), cert. denied, 368 U.S. 896, 82 S.Ct. 172, 7 L.Ed.2d 92 (1961); NLRB v. Int'l Longshoremen's and Warehousemen's Union, Local 10, 283 F.2d 558, 564 (9th Cir.1960); NLRB v. Local 135, Int'l Bhd. of Teamsters, 267 F.2d 870, 872-73 (7th Cir.), cert. denied, 361 U.S. 914, 80 S.Ct. 258, 4 L.Ed.2d 184 (1959)
 
 
 [20]
 Cf. Park Transfer Co. v. Lumbermen's Mutual Casualty Co., 142 F.2d 100, 100 (D.C.Cir.1944) (employer not responsible for murder of employee by co-worker in racial incident on the job site); Grimes v. Saul, 47 F.2d 409 (D.C.Cir.1931) (rape committed by employee not attributed to building owner)
 
 
 [21]
 Because we hold that the Union officials' acts were within the "scope of employment" under agency law, we need not address the NLRB's alternative theory for the agency relationship, the "apparent authority" doctrine. See Brief for Respondent at 18-19, 21-25. We note, however, that the "apparent authority" strain of agency law has been applied under the NLRA as an independent theory for the attribution of responsibility to a union. See NLRB v. Local 3, IBEW, 467 F.2d 1158, 1160 (2d Cir.1972); NLRB v. Local 815, Int'l Bhd. of Teamsters, 290 F.2d 99, 103-04 (2d Cir.1961) (Friendly, J.). By analogy, the Supreme Court has given approval to the liberal development of "apparent authority" doctrine to hold organizations responsible for the acts of their high officials in the context of other federal statutes. See American Soc'y of Mechanical Eng'rs, Inc. v. Hydrolevel Corp., 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982) (Sherman Act); United States v. Acme Process Equip. Co., 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966) (Anti-Kickback Act provides basis for United States' cancellation of contract)
 Apparent authority doctrine, however, may not be well-suited to a case such as this. When working within that doctrine, one must remain attentive to the question of to whom authority might be said to be "apparent." In the typical unfair labor practice, the critical audience is the workforce: the Act primarily protects their interests. Apparent authority doctrine under the NLRA has so recognized. In this case, however, the record nowhere indicates that Jackson's employees were aware of the kickback arrangement, at least until the supervening indictment in the criminal case was issued. Thus as an audience, the employees were shielded from most of this performance.
 
 
 [22]
 For evidence of this distinction at work, see NLRB v. District 50, UMW, 355 U.S. 453, 458-59, 78 S.Ct. 386, 389-90, 2 L.Ed.2d 401 (1958), and the numerous cases cited therein
 
 
 [23]
 See 29 U.S.C. Sec. 160(f) (1976); Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951)
 
 
 [24]
 Both in its brief, Reply Brief for Petitioner Jackson at 15, and at oral argument, Jackson adopted the position that approval of decertification here must necessarily be equated with the proposition that once the Employer became aware of the violations, it was legally obligated to cease recognizing the Union, even in the absence of any Board action in the matter. We emphasize that the latter situation, in which there has been no administrative or legal determination that an unfair labor practice has occurred, is clearly distinguishable from that at bar, and is most certainly not before this Court. We do not imply that an employer placed in the situation hypothesized would be obligated in the manner that Jackson suggests. We note, however, the decision of the Ninth Circuit that where the employees had designated a union as their bargaining agent, and had later discovered that a union official had accepted bribes from the employer, the employees were empowered to revoke the prior designation, and the employer was then justified in refusing to bargain with the union. See Hollywood-Maxwell, supra, 126 F.2d at 819-20, 823
 
 
 [25]
 In order to protect the employees' substantive interests, the Board provided the following:
 Nothing in our Order ... shall be deemed to require [Jackson] to vary or abandon those wage, hour, seniority, or other substantive features of its relations with employees established in the performance of the aforementioned collective-bargaining agreement, or to prejudice the assertion by the employees of any rights they may have thereunder.
 Board Decision at 6-7 (JA 401-02) (citing Sweater Bee by Banff, Ltd., 197 N.L.R.B. 805 (1972)).
 
 
 [26]
 As a threshold matter, the Court holds that the Board was not precluded from ordering reimbursement by either the ALJ's decision not to recommend that remedy, or the absence of an exception on that point by the General Counsel--or by those two factors taken together. NLRB v. WTVJ, Inc., 268 F.2d 346, 348 (5th Cir.1959) ("Even absent an exception, the Board is not compelled to act as a mere rubber stamp for its [ALJ]."); see Hedstrom Co. v. NLRB, 629 F.2d 305, 315-16 (3d Cir.1980) (en banc), cert. denied, 450 U.S. 996, 101 S.Ct. 1699, 68 L.Ed.2d 196 (1981); NLRB v. Duncan Foundry & Machine Works, Inc., 435 F.2d 612, 620 (7th Cir.1970); Kohler Co., 128 N.L.R.B. 1062, 1096 (1960), remanded on other grounds sub. nom. Local 833, UAW v. NLRB, 300 F.2d 699 (D.C.Cir.), cert. denied, 370 U.S. 911, 82 S.Ct. 1258, 8 L.Ed.2d 405 (1962). The conclusion that the Board was not precluded from ordering this remedy is particularly strong because the reimbursement remedy was before the ALJ and was briefed at that stage of this case: the petitioners cannot claim unfair surprise at this later stage
 
 
 [27]
 Under Supreme Court decisions, the question whether union members allegedly receive benefits from union bargaining that they might otherwise not have enjoyed is immaterial to the propriety of a reimbursement order. See Virginia Electric Power Co., supra, 319 U.S. at 543-44, 63 S.Ct. at 1220; Vernitron, supra, 548 F.2d at 27
 
 
 [28]
 In so limiting the scope of the reimbursement remedy, the Board cited, without comment, its decision in Unit Train Coal Sales, Inc., 234 N.L.R.B. 1265 (1978), enforcement denied on other grounds, 636 F.2d 1121 (6th Cir.1980). In that case, the Board limited the imposition of its reimbursement remedy to that time frame in which the union security clause could be deemed unlawful. See id. at 1273
 
 
 [29]
 The dissent suggests that the foregoing decision would permit the Board to "abrogate ... any bargaining relationship and any labor contract involving corrupt dealings between the employer and union officials." Dissent at 1405. That assertion is overbroad and misconstrues this opinion. Our approval of the Board's findings and remedial actions in this case is predicated upon the specific factual situation that was presented to the Board--a situation in which the entire relationship between the Union and Company was predicated from the beginning on the unlawful assistance to the Union and subsequent kickbacks to the Union's principal officers. From the very beginning of negotiations it was agreed between the officers of the Union and the Company that the Union would benefit materially from the corrupt arrangement and that the corrupt payments would not begin until the Company's employees joined the Union, and both of these requirements which materially benefitted the Union were complied with before any sums were paid. We intimate no views on other cases, differing in kind or in degree, that might come before the Board.1 Although the Board also found violations of Sec. 8(a)(1) and Sec. 8(b)(1)(A), making it unlawful for an employer and a labor organization respectively to restrain or coerce employees in the exercise of their rights under the labor laws, those violations are entirely derivative of the Sec. 8(a)(2) violation
 
 
 [2]
 In Conair Corp. v. NLRB, 721 F.2d 1355 (D.C.Cir.1983), this court held that the principle of majority support is so central to the statutory scheme that the NLRB may never issue a bargaining order in the absence of evidence that the union had a majority before the employer's coercive conduct took its toll. 721 F.2d at 1377-84. I dissented. In my view, the Board had adequately supported its conclusion that the employer's massive and unprecedented campaign of coercion had eliminated any possibility of a fair election and that a temporary bargaining order was the only possible means of restoring employee freedom of choice. See id. at 1387-1401. The majority decides here, ironically, that the principle of majority rule and freedom of choice is so unimportant that a collective bargaining representative whose majority status is not in doubt may be ousted on the basis of individual officers' corruption bearing no demonstrated relationship to the quality of the representation in collective bargaining